## S93A0957. LINGO v. THE STATE.
(437 SE2d 463)

HUNT, Presiding Justice.

Rodney Dwayne Lingo was convicted of murder, theft by taking of a motor vehicle, and armed robbery. He was indicted for but found not guilty of rape. The state unsuccessfully sought a death sentence. Lingo received a life sentence for murder, a consecutive life sentence for armed robbery, and a consecutive 20-year sentence for theft by taking.[1]

At the time the victim, Tracy Plank, was killed, Lingo was living

---

[1] The crimes were committed on November 4, 1985. Lingo was indicted on June 16, 1986. The trial was held in Houston County Superior Court on August 21-26, 1986, and Lingo was sentenced on August 26, 1986. Lingo filed a motion for new trial on September 25, 1986. The court reporter certified the trial transcript on October 6, 1990, and certified the voir dire transcript on August 24, 1991. A hearing was held on the motion for new trial on July 15, 1992, and the motion was denied on November 19, 1992. A notice of appeal was filed on December 17, 1992, and the appeal was docketed in this Court on March 29, 1993. Oral arguments were heard on June 23, 1993.

with a friend or acquaintance of the victim, Teresa Cooper. The evidence showed that on the evening of November 4, 1985, the victim and Lingo left the home of a mutual friend together in the victim's car. Several hours later, Lingo was seen driving the victim's car alone. The next day, Lingo was seen wearing the victim's jacket and trying to sell parts of the victim's car. The victim's body was found in a roadside wooded area about five days later. She had been shot twice in the head with a gun belonging to Lingo. In statements given to the police, Lingo claims that another friend, who was riding around with him and the victim, was the one who actually shot the victim. In subsequent statements, Lingo implicates two other, different people with pulling the trigger.

1. In his first enumeration of error, Lingo, who is black, contests the trial court's ruling that the reasons given by the prosecutor for the exercise of his peremptory strikes were adequate under *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986), and its progeny.[2] We find that notwithstanding the prima facie inference of racial discrimination, the record supports the trial court's findings that the prosecutor's reasons for his strikes were racially neutral, and shows that the prosecutor was able to overcome the prima facie case.

(a) The venire was made up of 50 qualified jurors, and the petit jury was selected from the first 47 jurors called. Of those 47 jurors, 34 were white and 13 were black. The state exercised its ten peremptory strikes against the first ten black venire members called. After the state had exhausted its peremptory strikes, two black jurors were added to the petit jury by the defense. The state then used its only peremptory strike for alternate jurors on the first black potential alternate juror to be called. The record does not indicate the race of the three qualified jurors who remained after the jury was empaneled. Therefore, at least thirteen and no more than sixteen of the fifty qualified jurors were black (26 percent to 32 percent), and two of the twelve jurors who served were black (16.7 percent). The prosecutor exercised 100 percent of his peremptory strikes to exclude black jurors and did not accept any of the black jurors called before he exhausted his strikes.

"[T]his 'overwhelming' 'pattern' of strikes establishes a prima facie inference of racial discrimination." (Citations and punctuation omitted.) *Ford v. State*, 262 Ga. 558, 559 (423 SE2d 245) (1992). See also *Gamble v. State*, 257 Ga. 325, 327 (357 SE2d 792) (1987) and *Williams v. State*, 262 Ga. 732 (426 SE2d 348) (1993). To overcome

---

[2] This case was tried just a few months after the United States Supreme Court's decision in *Batson* and prior to any decisions of this court. Nevertheless, the trial court required the state to explain each of its peremptory strikes in response to the defendant's *Batson* challenges.

this inference of discrimination,[3] the prosecutor must present "concrete, tangible, race-neutral and neutrally-applied" reasons for the strikes exercised against black venire members. *Ford*, 262 Ga. at 560. The greater the disparity between the percentage of black jurors in the venire and the percentage of strikes exercised by the state against black jurors, the more likely it becomes that racial bias underlies the exercise of the peremptory challenges, and the greater the scrutiny the trial court must apply to the prosecutor's proffered explanations "to ensure that we honor *Batson*'s command to eliminate racial discrimination from the exercise of peremptory challenges." Id. at 560-561. The prosecutor in this case exercised 100 percent of his strikes against black jurors, while black jurors made up no more than 32 percent of the qualified venire. Where such a considerable disparity exists the prosecutor's explanations for his peremptory challenges must be "strong enough to *overcome* the [defendant's] prima facie case." Id. at 559.

(b) Thus, we must review the prosecutor's stated reasons for his strikes to determine whether they overcame the defendant's prima facie case of discrimination. In so doing, we must give the trial court's factual findings "great deference." *Batson*, supra, 106 SC at 724. See also *Gamble v. State*, supra at 327 (5); *Isom v. State*, 261 Ga. 596, 598 (2) (408 SE2d 701) (1991). We may only disregard those findings if they are clearly erroneous. *Gamble v. State*, supra at 327 (5). Of course, we may still disagree with the trial court's conclusions based on those findings and where there is a strong prima facie case, as here, we must carefully scrutinize those conclusions. We review each of the prosecutor's strikes as follows:

(1) The prosecutor gave as his reasons in support of his first strike, which was against a black woman, the fact that the woman was "indecisive" about the death penalty, and preferred a life sentence, and that she had a hearing problem. The trial court concurred in the prosecutor's statements regarding the juror's testimony on voir dire, and found the prosecutor's reasons to be race-neutral.

(2) The prosecutor's reasons for his second strike, against a black man, were that he was strongly opposed to the death penalty, and had a DUI conviction. The trial court agreed with the prosecutor's account of this juror's testimony, and found the reasons to be race-neutral.

(3) The prosecutor's reasons for his third strike, against a black woman, were that she was hesitant about the death penalty, and initially stated she would not stand up and affirm a verdict of death and

---

[3] We do not, by affirming *this* conviction mean, in any way, to minimize the weight of such an inference under these circumstances.

the death penalty, and that she was familiar with the case and a witness in the case. The trial court, in finding these reasons to be race-neutral, specifically concurred in the prosecutor's account of this juror's testimony.

(4) The prosecutor gave as his reasons for his fourth strike, against a black woman, the fact that she was opposed to the death penalty, and knew a witness in the case. The trial court found these reasons race-neutral, and specifically stated its recollection of the juror's testimony as consistent with the prosecutor's account.

(5) The prosecutor's reason in support of his fifth strike, against a black man, was that the juror made it very clear he did not want to serve, that the prosecutor was concerned the juror would be preoccupied with his financial problems, and that the prosecutor had difficulty in getting the juror to respond or pay attention to his questions. The trial court found these reasons to be race-neutral, specifically recalling that the juror could not keep still during the voir dire, and, itself, questioning whether "from his demeanor" this juror was "competent to handle this type of situation."

(6) The prosecutor's reasons in support of his sixth strike, also against a black man, were that the juror was opposed to the death penalty, and was familiar with the defendant and with a witness. The trial court specifically recalled this juror's testimony as consistent with the state's account, and found the state had articulated race-neutral reasons for the strike.

(7) The prosecutor's reasons in support of his seventh strike, against a black woman, were that she was very opposed to the death penalty, and that if she served, the prosecutor was concerned she would be preoccupied with a sick child at home. The trial court stated its recollection was consistent with the state's explanation. Moreover, the trial court noted his recollection that the juror clearly did not want to be there, and someone had to be sent to get her for jury duty.

(8) The prosecutor's reasons for his eighth strike, against a black man, were that he was initially hostile in his responses, and this juror and the prosecutor "got off on the wrong foot at the very start." The prosecutor also gave as reasons the fact that the juror's criminal justice degree might affect his objectivity, and that the juror had testified as a character witness on behalf of a defendant in a prior case. The trial court, in accepting the prosecutor's reasons as race-neutral, specifically recalled this juror's responses as belligerent.

(9) The prosecutor's reasons for his ninth strike, against a black woman, were that she knew a witness in the case, could not give her sentence if polled, and that she had a conviction for shoplifting. The trial court found these reasons to be race-neutral.

(10) The prosecutor gave as his reason for his tenth strike, against a black man, that the juror had a prior conviction, and had

indicated on the jury questionnaire that he had a "bad check problem." The trial court found these reasons to be race-neutral.

(11) Finally, the prosecutor gave as his reasons for striking an alternate juror, a black woman, the fact that she was opposed to the death penalty, as well as the fact that she was a teacher and school was to start the following Monday. The trial court found these reasons to be race-neutral.

(c) The record supports the trial court's findings that the reasons given by the prosecutor were not racially motivated, and demonstrates that the prosecutor was able to overcome the very strong prima facie inference of racial discrimination.

The dissent correctly cites *Strozier v. Clark*, 206 Ga. App. 85, 88 (424 SE2d 368) (1992), a recent Court of Appeals case, for the rule that where racially-neutral and neutrally-applied reasons are given for a strike, the simultaneous existence of any racially motivated explanation results in a *Batson* violation. However, the dissent would misapply this rule by creating a presumption that *any* reason for striking a black juror, not also used against a white juror — regardless of other reasons for striking a black juror — is, per se racially motivated. This is not what *Batson* or *Strozier* hold, or even imply.[4] Rather, there is a *Batson* violation only where the prosecutor's explanation is determined to be racially motivated. Where there are multiple reasons for striking a juror, white or black, it *cannot* be *presumed* that a reason applied to one juror, of one race, but not applied to another

---

[4] The purpose of *Batson*, and the holding the dissent cites from *Strozier v. Clark*, is to preclude the use of peremptory strikes for racially motivated reasons. To that end, *Strozier* (citing two cases from Texas, and one from South Carolina) states that a racially motivated explanation for striking a juror will invalidate the entire jury selection, even though a racially-neutral explanation is also given. In essence, *Strozier* stands for the proposition that where it can be determined that the racially-neutral explanation is, in fact, pretextual since there is a racially motivated reason that can be independently determined, the jury selection process is invalid under *Batson*. *Strozier* does not hold that where one racially-neutral reason is given for striking a juror, *any* additional reason, not also used against a juror of another race, is per se racially motivated. The cases cited by *Strozier* illustrate that there must be some indication that the "additional reason" is, *in fact*, racially motivated. In *Moore v. State*, 811 SW2d 197 (Tex. App. 1991), the prosecutor stated that she struck one juror, in part, because that juror was a member of a minority club. Of course, this was not a racially-neutral reason, notwithstanding that the prosecutor also gave, as a reason for striking this juror, that the juror was hesitant to impose a life sentence. In *State v. Tomlin*, 384 SE2d 707 (S.C. 1989) the prosecutor gave the racially-neutral reason for striking a juror as the fact that the juror was unemployed, but also stated that the juror "shucked and jived." In *McKinney v. State*, 761 SW2d 549 (Tex. App. 1988) the prosecutor *admitted* that race was a factor in striking the juror in question. In *Strozier* itself, the prosecutor, in addition to stating the apparently neutral reason of the juror's age as his reason for striking her, also gave his completely unsupported opinion that the juror was dishonest in her answer to questions, an opinion he stated was based on an experience the prosecutor had previously, with other jurors, in an unrelated case. Thus, in *Strozier*, as well as the cases cited in its support, it is apparent that the "additional reasons," in themselves, were racially motivated and, accordingly, rendered the selection process invalid under *Batson*.

juror, of another race, is racially motivated.

Of course we are required, in a strong prima facie case such as here, to carefully examine the prosecutor's remaining reasons, to determine if there is an underlying racial motive. And, where a reason is given against a black juror, not also used against a white juror, the reason is particularly suspect. *Ford*, supra at 559. However, we are not authorized to create an inference of discrimination where none is apparent, and where none has been found by the trial court, to whose findings we must give great deference. Compare *Ford*, supra at 559, where the prosecutor's explanations for his strikes were almost, as the defendant contended, "fanciful." Compare also fn. 4, supra, regarding *Strozier*, and the cases cited therein. While we are required to carefully review the record in a case involving a *Batson* challenge, especially where a strong prima facie case is made, we are still required to give the trial court's findings "great deference," and we are not authorized to ignore them. See Division 1 (b), supra. Here, the trial court's findings are not clearly erroneous.

The dissent not only would entirely bypass the trial court's findings, but would create a new rule to the effect that, notwithstanding a valid reason for a strike against a black juror, any additional reason applied against a black juror, not also applied against a white juror is, ipso facto, racially motivated. This would be a radical departure from *Batson* and *Strozier*, and would create an almost impossible dilemma for prosecutors (or, indeed, for lawyers for any party in a civil or criminal case, since *Batson* applies in those instances as well).[5] Further, the dissent would have this court act as a de novo forum for *Batson* review.

For the foregoing reasons, we find no error in the denial of Lingo's challenges based on *Batson v. Kentucky*, supra.

2. We find no merit to Lingo's remaining enumerations of error.

*Judgment affirmed. All the Justices concur, except Benham and Sears-Collins, JJ., who dissent.*

SEARS-COLLINS, Justice, dissenting.

When it comes to grappling with racial issues in the criminal justice system today, often white Americans find one reality while Afri-

---

[5] It is often stated that a trial lawyer does not "select" a jury so much as eliminate as jurors those whom he thinks will be worse for his side. The fact that a black juror is adamantly opposed to the death penalty and knows a witness in the case, and that those two reasons are given by the prosecutor for striking that juror, does not mean (as the dissent would hold) that the prosecutor's strike is racially motivated because he did not also strike a white juror who knows a witness but has no problem imposing the death penalty. The dissent would require the prosecutor to go only with his "best shot" in support of any strike, notwithstanding the fact that additional reasons make the particular juror a worse prospect than other jurors.

can-Americans see another. This perception gap is evident in the majority's affirmance of Rodney Dwayne Lingo's conviction. As I cannot ignore the race-based innuendo and subtle stereotyping used to exclude people of color from Lingo's jury, I must dissent.

1. The prosecutor exercised 100 percent of his peremptory strikes to exclude the *first* ten black jurors called from the venire. He was content with none of the African-American jurors called before he exhausted his strikes. This is an "overwhelming pattern" of strikes, as recognized by the majority, and establishes a powerful prima facie inference of racial discrimination.[6] Majority opinion at 664 (quoting *Ford v. State*, 262 Ga. 558, 559 (423 SE2d 245) (1992)). It is up to the prosecutor to present "concrete, tangible, race-neutral and neutrally-applied" reasons for the strikes exercised against black venire members. *Ford*, 262 Ga. at 560. In deciding whether the reasons given by the prosecutor were "neutrally applied," we consider whether the reasons given could apply equally to white jurors who were not struck by the prosecutor. *Williams v. State*, 262 Ga. 732, 734 (426 SE2d 348) (1993). "A prosecutor's failure to explain the apparently disparate treatment of similarly situated white and black jurors . . . diminishes the force of his explanation for striking a black juror." *Ford*, 262 Ga. at 560, n. 1.

Even if racially-neutral and neutrally-applied reasons are given, the simultaneous existence of any racially motivated explanation " 'vitiates the legitimacy of the entire (jury selection) procedure.' " (Citations omitted.) *Strozier v. Clark*, 206 Ga. App. 85, 88 (424 SE2d 368) (1992). This is so because in the eyes of the law, a person's race is simply unrelated to his fitness as a juror, *Batson v. Kentucky*, 476 U. S. 79, 87 (106 SC 1712, 90 LE2d 69) (1986), and the presence of any racial bias whatsoever in the jury selection process renders total racial neutrality impossible.

2. Under the law set forth above and for the reasons that follow, I disagree with the majority that the prosecutor successfully rebutted the prima facie case of racial discrimination in this case.

(a) The prosecutor explained that one potential black juror was struck because: he was "touchy" about one of the prosecutor's first questions and "hostile from there on"; he had previously testified in a trial as a character witness; and he had taken some criminal justice classes. The voir dire examination of this juror is set forth verbatim

---

[6] While a challenge on appeal to the *validity* of a prima facie case may be precluded "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination," *Hernandez v. New York*, 500 U. S. ____ (111 SC 1859, 1866, 114 LE2d 395) (1991); see also *Lewis v. State*, 262 Ga. 679, 680 (424 SE2d 626) (1993), the *strength* of the prima facie case remains relevant to the question of whether that case has been overcome. See *Ford v. State*, 262 Ga. 558 (423 SE2d 245) (1992).

as follows:

BY MR. LUKEMIRE [the prosecutor]:

Q Mr. Cothran, my name is Ed Lukemire; I'm with the District Attorney's office. Mr. Cothran, that's Mr. Cook, he's the defendant's attorney, and each of us will ask you just a few questions and then hopefully we can get you on the road before too much longer. I know it's been a long week for you. This is a potential death penalty case, and because of that I have to begin by asking you this question: Are you so conscientiously opposed to capital punishment that you would not vote for the death penalty under any circumstances?

A No.

Q Okay. So sometimes you would and sometimes you wouldn't?

A Yes.

Q In a death penalty case, what happens is, and you may already be aware of this — you're a criminal justice major; you've taken some courses in criminal justice; is that right?

A How was that revealed to you, sir? Was I supposed to answer that?

Q Well, that's fine, but you put it on your questionnaire.

A Oh, okay. I have forgot I put it down there, but I have taken some courses.

Q So you already know this, I don't know, but in a death penalty case what happens is that trial is divided into two parts. The first part is called a guilt-innocence phase and the jurors there, the only thing they're considering is whether or not the defendant did some or all of what he's accused of. They don't — in phase one they don't look at punishment at all; it's just guilt or innocence.

Now, if and only if in phase one they find the defendant guilty of murder, then they move into phase two which we call the sentencing phase, and in the sentencing phase the obvious purpose is to determine what punishment to give for someone that's already been convicted of murder.

So the question I need to ask, let's assume for a minute that you're on the jury and that y'all have gone through phase one and you found the defendant guilty of murder; you move into phase two. You understand that you would be authorized, the Court would authorize you

to consider the death penalty as a sentence, but you'd also be obligated to consider life as a sentence? Now, would you be able to consider both of those options?

A Yes.

Q Okay. Do you know Mr. Cook or any member of his family or have you ever used his law firm for any of your business?

A No, sir.

Q Okay. Do you know the defendant or his family?

A No, sir.

Q Now, this trial will last several days and during the trial the jurors will be sequestered, so — and I don't know which hotel it would be or what, but will that fact present any great hardship for you or some big problem for you?

A No, sir.

Q Okay, is there anything about your home situation or your business that would keep you from giving this case your undivided attention.

A No, sir.

Q Okay, now, you know, there's no problem if there is stuff we need to know so we can, you know, get all the information we can. Are you suffering from any physical infirmity that would prevent you from serving as a juror, like a hearing impairment or anything like that?

A No, sir.

Q Okay. Do you belong to any organization or any denomination, church denomination that is officially opposed to capital punishment?

A No, sir.

Q Can you think of any friend or relative that you have that, you know, if you sat on the jury and you made a decision and then went home and it wasn't what they wanted you to decide, they'd give you a hard time; can you think of anybody like that?

A No, sir.

Q Now, sometimes when a verdict is rendered, the jury is polled, and let's assume in this case you're on the jury and that y'all have brought back a sentence of death. Would you be able to stand in open court along with the other jurors, would you be able to stand and say, Yes, that's my sentence?

A If I had reached that determined statement or determined thought based on what I have heard, then I could stand.

Q It's just, you know, some jurors have a real problem standing in front of other people and saying, Yes that's my ver-

dict, so we have to ask that. Okay. Have you ever had any jury experience before?

A No, sir.

Q Okay. You understand that the function of a juror would be, of course, to hear the evidence, all the evidence, but also to, you know, go in the jury room to listen to the other 11 people, to take into consideration the other 11 people's thoughts about the case and finally to let those other 11 people know what that juror thinks about the case, its input?

A Yes.

Q All right. Would you be able to perform those functions as a juror?

A Yes, sir, I could.

Q Okay. Do you recognize the principle of law that a person is presumed innocent until proven guilty, and certainly the fact that they've been indicted or that they sit in the courtroom does not make them guilty or —

A I understand that.

Q And if the Court charges you that the State has the burden of proving the defendant guilty of the elements of the crime beyond a reasonable doubt —

A Right.

Q — will you follow that charge?

A Yes, sir.

Q Now, if the Court charges you that proof beyond a reasonable doubt is not proof beyond all doubt, but is simply proof to a moral and a reasonable certainty, would you follow that charge?

A If within myself, with the evidence that I have heard and able to reach an agreement within myself, then I would follow that.

MR. LUKEMIRE: Thank you.

With respect to this juror, the trial court stated:

As far as Mr. Cothran was concerned, that one got very close to the line, but I do recall when he did make the response concerning the criminal justice degree that it definitely, just from an oral response, I was not looking at him, it caught my attention that he did seem to be belligerent, and I will be very candid about this, had there been no blacks on this jury, the court would have had real trouble with not possibly finding there might have been some type of pattern, just with [this juror].

Contrary to the trial court's statement, however, the fact that two black jurors were added to the jury after the prosecutor had exhausted his peremptory strikes is irrelevant to the inquiry of whether this juror was struck because of racial bias, and does not eliminate the obvious racial discrimination in the prosecutor's strike against this juror. Moreover, the trial court's statement indicates that but for this irrelevancy it would have found racial bias in the striking of this juror. Furthermore, the above portion of the record reveals that other than being initially surprised by the prosecutor's knowledge of information the juror had provided on his juror questionnaire, the juror showed no indication of being "hostile" towards the prosecutor. Even giving great deference to the trial court, I still cannot believe that a white juror who gave exactly the same responses to the voir dire questions that this juror gave would have been labeled "hostile" and "belligerent."[7] The hostility and belligerence found so readily by the prosecutor and the trial judge from this juror's one response evoke stereotypical images of the angry black man, who, at the slightest provocation and at even the faintest appearance of challenging the status quo will be tagged "hostile" or "belligerent."[8]

The prosecutor further explained that he excluded this juror because he had served as a character witness in another proceeding. This reason was not neutrally applied, however, because the prosecutor accepted without complaint a white juror who had previously testified in a trial as a character witness. The prosecutor also explained that he did not want this juror on the panel because he had taken criminal justice classes. While a juror's legal background often justifies a strike, in this case the prosecutor asked the juror not one question as to whether the juror would be influenced by the classes he had taken, and when asked specifically whether he could follow the charge of the court the juror responded that he could do so.

To conclude, even assuming that the fact that the juror had taken some criminal justice classes was a non-racially motivated reason for striking this juror, both the prosecutor's application of the racial stereotype of the "hostile black male" and his failure to neutrally apply his other reason for striking this juror force me to conclude that improper racial motives played a role in the prosecutor's striking the juror.

(b) The prosecutor explained that he struck one prospective ju-

---

[7] The American Heritage Dictionary defines "belligerent" as "ready to fight; pertaining to or engaged in warfare." Even understanding that such considerations as body language and tone of voice are not apparent from the record, could anyone reading the foregoing transcript really describe this man as belligerent?

[8] This nation is great because it encourages rather than discourages strong individuals to participate in our system of justice. It should be no detriment that an individual exhibits the ability to freely think about issues and express himself accordingly.

ror, who was young, black, unemployed, and lived with his unemployed girl friend and her three children, because he "made it very clear he did not want to be here" due to his financial problems, and might not be able to concentrate. When asked if he would have problems with service, this juror responded as follows:

> That's going to cause me big problems. It's going to cause me a heap of problems. See, I've got a heap — I've got bills all the way up to my neck to pay. I can't keep, I can't keep running down here and all because my girlfriend ain't working, and it's kind of hard on me. I can't go.

The record reveals that when asked, the juror stated that he would *not* have a problem focusing his attention on the trial. Moreover, the prosecutor accepted a white juror who was unemployed, and at least three other white jurors with whom the prosecutor was content stated specifically that jury service would be inconvenient or would pose a financial hardship for them. Compare the explanation given by one of the white jurors who expressed a problem with service on financial grounds:

> I'd like to tell the court that I'm a contract laborer. I work for General Telephone, and if I don't work, I don't get paid, you know. I have no sick leave, no vacation leave, and I support my family, and it's, you know — you know, I know I have a civil duty to be here, but it's hard to make a living on what I have, you know, the money we receive.

While the white juror may have been better able to articulate his position, he made it no less clear that he did not want to be there. Yet the prosecutor accepted the white juror.

I would find on the basis of either of the above jurors alone that the prosecutor failed to overcome the powerful prima facie case of racial discrimination. In rebuffing the *Batson* challenge, the majority stresses the *Batson* edict that the trial court is to be afforded "great deference." *Batson*, 476 U. S. at 98, n. 21. I do not believe that "great deference" means ignoring blatant discrimination. The additional manifestations of racial bias described below buttress the conclusion that the prosecutor's intent was to exclude from the jury as many black jurors as possible.

(c) With respect to seven of the black jurors struck by the prosecutor (including a prospective alternate juror), the prosecutor explained that the jurors had some aversion to the death penalty. The record reveals that one of the black jurors struck for this reason repeatedly indicated she was willing to impose a death sentence if warranted by the circumstances, and two others were hesitant about the

death penalty, but said that they could consider it as a form of punishment after hearing the evidence. However, in ruling in the state's favor on the defendant's *Batson* motion, the trial court stated his recollection that while both black and white jurors expressed hesitancy about the death penalty, the black jurors struck for that reason were more adamant against the death penalty than were the white jurors. Even if we defer to the trial court's decision that this is a race-neutral reason, the fact remains that included among the prosecutor's reasons for striking those jurors were other reasons that were not well-founded in the record or were not neutrally applied among the black and white jurors. For example, the prosecutor reasoned that one potential juror would not be able to state her decision when polled in court. The record reveals, however, that the juror initially misunderstood the prosecutor's question; when it was clarified, she said that she would be able to give her decision when polled. Also, the prosecutor stated that one black prospective juror was struck because the juror had a hearing problem. While the prosecutor said that the juror had a hearing problem, the record indicates that the juror never claimed to have a hearing problem, and the state had no objection to a white juror who told the prosecutor twice during voir dire that he had a hearing problem.

(d) The prosecutor stated that four black jurors were struck, among other reasons, because they knew witnesses. The record reveals that the state accepted six white jurors who also knew witnesses. Two of the four black jurors struck for this reason indicated they knew witnesses by sight but did not have personal relationships with those witnesses. Among the white jurors accepted by the state who knew witnesses, however, one played cards with two witnesses, while another had lived in the same neighborhood and belonged to the same church as a witness.

While race-neutral reasons were also given for the black jurors who knew witnesses (three were among those black jurors who expressed objection to the death penalty, one had a previous shoplifting conviction), the additional presence of reasons which were not applied neutrally among the races clearly taints these strikes with racial bias.

3. At least one of the prosecutor's strikes against a black juror was exercised solely on race-based grounds. That is enough in itself to reverse Lingo's conviction. Furthermore, the prosecutor's failure to apply the reasons for his strikes neutrally among many of the black and white prospective jurors, though subtle, was manifest and pervasive and clearly demonstrated that racial motives served in part as the basis for the strikes. While the prosecutor may have included arguably race-neutral reasons among his reasons for striking most black prospective jurors, the additional racial basis for his strikes so infected the jury selection process that the appellant could not have

received a fair trial.

The majority states that I would apply *Strozier v. Clark*, supra, to "creat[e] a presumption that *any* reason for striking a black juror, not also used against a white juror — regardless of other reasons for striking a black juror — is, per se racially motivated." Majority opinion at 667. That is not correct. To the contrary, as the majority itself notes, the inference of discrimination in this case is created by the prima facie case, majority opinion at 664-665, which the prosecutor carries the burden of overcoming. I would apply to this case the rule established by this court that where there is a strong prima facie case, the prosecutor's reason for his strikes must be neutrally applied. Moreover, contrary to the implication in the majority, I do not say that any *one* non-neutrally applied reason renders the jury selection invalid, but that when inequity in application so permeates the process, the fact that a race-neutral reason was also given cannot, as it could not in *Strozier*, remedy the discrimination. The majority opinion does not refute the *Strozier* rule, but implies that it should not apply in this case because the "bad" reasons in *Strozier* were facially race-based or pretextual, whereas in this case it is necessary to look at all of the reasons given by the prosecutor to discern the overriding racial foundation for the strikes. I believe that this is a dangerous distinction without a difference, as subtle racial discrimination is just as damaging, if not more so, as overt racial discrimination.

We stand at the edge of the 21st century and many people of color in this country are still not free from insidious racial discrimination such as that manifested in this case. The constitutions of the United States and of Georgia demand the *total, uncompromising* racial neutrality of the jury selection process to ensure every American's right to fully participate, and Rodney Dwayne Lingo did not receive that neutrality. My candor in this dissent may lead some to believe that I am "hostile." I am not. I am, however, fully committed to the promise of the U. S. and Georgia constitutions to afford their rights and privileges to all citizens.

DECIDED DECEMBER 3, 1993 —
RECONSIDERATION DENIED DECEMBER 17, 1993.

*Jeffrey L. Grube,* for appellant.

*Edward D. Lukemire, District Attorney, Michael J. Moore, Assistant District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Matthew P. Stone, Staff Attorney,* for appellee.