S95P0680. WELLONS v. THE STATE.
(463 SE2d 868)

THOMPSON, Justice.

Marcus A. Wellons was convicted of the malice murder and rape of 15-year-old India Roberts. The jury found as statutory aggravating circumstances that the murder was committed in the course of two other capital felonies, rape and kidnapping with bodily injury, and that the murder was wantonly vile and horrible in that it involved torture to the victim before death and depravity of mind. The jury sentenced Wellons to death for the murder. He received a life sentence for the rape. Wellons appeals from the judgments entered by

the trial court.[1] Wellons contends among his 35 enumerated errors that, by erroneously requiring him to disclose the identities and reports of all experts with whom he consulted pretrial, whether or not he chose to call the experts to testify, the trial court so chilled his consultation with experts that he was prevented from effectively presenting his insanity defense in the guilt-innocence phase of trial and his evidence in mitigation in the sentencing phase. We disagree, finding that although based on present law the trial court's ruling was in error, Wellons suffered no harm. Having thoroughly considered each of Wellons' enumerated errors and the entire record on appeal, we affirm.

1. The evidence presented at trial authorized the jury to find the following facts:

Throughout the summer of 1989, Wellons lived with his girl friend, Gail Saunders, in her townhouse apartment in Cobb County. Early that summer, Saunders' 14-year-old son Tony also lived in the apartment. Tony and the victim, who lived in a neighboring apartment with her mother, were friends. The victim occasionally visited Tony inside Saunders' apartment, where the two youths would watch television or play Nintendo. Wellons encouraged Tony to date the victim, remarking several times that she was a good-looking girl. At some point during the summer, Tony moved to Chattanooga to live with his grandparents. The victim continued to spend time with Saunders occasionally. Saunders described herself as the victim's "play mommy" with whom the victim shared confidences.

Wellons and Saunders had become acquainted at the hospital where both worked, Wellons as a counselor in the psychiatric ward. Wellons moved in with Saunders on the pretense that he owned a home but was unable to occupy it, because an ex-girl friend had moved there with her two young daughters, and he could not in good conscience turn them out. Over the summer Wellons proposed marriage to Saunders. However, by then Saunders had become wary of Wellons, who was increasingly hostile and abusive. She verbally accepted his proposal out of fear, all the while seeking an escape from her predicament.

On the evening of August 30, 1989, Saunders told Wellons that their relationship was over and that he must move out of her apart-

---

[1] The crimes occurred on August 31, 1989. Wellons was indicted on April 5, 1990 and reindicted on December 3, 1991. On April 20, 1990, the state filed its notice of intent to seek the death penalty. Voir dire commenced on May 19, 1993, and the trial of the case began on June 1, 1993. The jury returned its sentencing phase verdict on June 8, 1993, and the trial court sentenced Wellons that same day. Wellons filed a motion for new trial on July 2, 1993. He amended the motion on June 23, 1994. The trial court denied the motion on October 5, 1994. Wellons filed his notice of appeal on November 3, 1994. The case was docketed on January 20, 1995 and orally argued on June 19, 1995.

ment. Wellons, who had recently been fired from his job, purchased a one-way ticket to Miami for a flight departing on the evening of August 31. Fearing to be alone with Wellons the night before his departure, Saunders told Wellons that she was going to Chattanooga to spend the night with her parents and enroll Tony in school. Instead, Saunders went to the home of a female friend.

That evening, Wellons began making desperate attempts to reach Saunders by telephone. He called her mother in Chattanooga repeatedly, only to be told that Saunders had not arrived. Wellons then called Saunders' friends, but no one knew or revealed her whereabouts. He called his mother and told her he suspected that Saunders was with another man. Wellons became increasingly angry and began drinking. He ransacked Saunders' apartment. He overturned potted plants and furniture, threw flour onto the floor, and poured bleach over all of Saunders' clothes, carefully sparing his and Tony's belongings in the process.

After the apartment was demolished, Wellons began attempts to cover up his deed. He broke a window, from the inside out, cutting his hand in the process and smearing blood around the apartment. He stacked electronic equipment by the door. He then called 911 at approximately 3:00 a.m. on August 31 to report a burglary. When a police officer arrived, Wellons told the officer that he had come home to find the apartment ransacked, although no items were missing. Wellons explained to the officer that he cut his hand while struggling to uncover a stash of money to determine if it had been taken. Sometime after the officer left, Wellons wrote a racial slur across the wall in Saunders' bedroom.

Several hours later, at approximately 8:00 a.m., the victim said goodbye to her mother and walked from her apartment, past Saunders' door, toward the school bus stop. Shortly thereafter, Saunders' next door neighbor heard muffled screams from inside Saunders' apartment.

The apartment building was close to a wooded area, beyond which was a grocery store. At approximately 2:00 p.m., Wellons approached an acquaintance who was employed at the grocery store and asked to borrow a car. The acquaintance refused. Wellons told the acquaintance that when he (Wellons) returned home the previous night, he encountered two white men who were burglarizing the apartment. Wellons said that he successfully fought off the intruders but explained that he had in the process sustained the injuries to his hand.

About half an hour later, Theodore Cole, a retired military police officer, was driving near the wooded area behind the apartment complex. He spotted in the distance a person carrying what appeared to be a body wrapped in a sheet. He distinctly saw feet dangling from

the bottom of the sheet. Cole drove on but then returned for a second look. He drove around in the parking lot of the apartment complex and saw nothing. As he was driving away, however, he saw a man in his rear view mirror walk along the road and throw a sheet into the woods. Cole drove directly to the grocery store, where he called 911. Police officers arrived quickly and began a search of the woods.

The police first discovered sheets, clothing and notebooks bearing Tony's name. Then, upon close inspection of a pile of tree branches near where he had seen the man carrying the sheet, Cole spotted the body of India Roberts. When the branches were removed, the officers discovered that the victim was completely unclothed, with cuts on one side of her face and ear and bruises on her neck.

During the search of the woods, Cole spotted a black man with a bundle under his arm near the apartment building and identified him as the man Cole had seen carrying the sheet. Cole and an officer chased the man, but as they approached the building, the man turned the corner and Cole and the officer heard a door shut. The officer learned from a passerby which apartment was occupied by a man fitting the description given by Cole. He knocked on Saunders' door and announced his presence, but there was no answer. He returned to join the other officers, who were investigating the scene in full force, with helicopters overhead.

Wellons, now trapped inside Saunders' apartment with residual evidence of his crime, gave up his attempt to dispose of the evidence in the woods. He first tried to clean the apartment and his clothes. He then abandoned that project, changed into swim wear, grabbed an old, yellowed newspaper and a cup of wine, partially barricaded and locked the door, and headed for the pool. On his way, Wellons caught sight of a police officer and stopped abruptly. The officer began questioning him. Initially evasive, Wellons did ultimately tell officers that the injuries to his hand, and new scratches to his face, were sustained during a scuffle with two men whom he had caught burglarizing Saunders' apartment.

While investigating the scene, officers had asked Cole whether either of two black males was the man Cole had seen carrying the sheet. Cole immediately ruled out each of the men. Then, while officers were questioning Wellons, one officer standing at a distance from the questioning asked Cole whether Wellons was the man he had seen. Cole said that although Wellons was wearing different clothing from the man he had seen carrying the sheet, and whom he had again seen near the complex, Cole was 75 to 80 percent certain that Wellons was the same man.

Later that day, officers searched Saunders' apartment. Inside, they found numerous items of evidence including the victim's notebooks and earrings. In Tony's room, they discovered the victim's

panties. They also found blood on Tony's mattress and box springs. The mattress had been flipped so that the bloody portion was facing downward, and the bed had been remade.

The autopsy revealed that the victim died from manual strangulation, which in itself would have taken several minutes. The autopsy also showed that Wellons had attempted to strangle the victim with a ligature, possibly a telephone cord, and that he had bruised her and cut her face and ear with a sharp object. The evidence suggested that Wellons had dragged or otherwise forcibly moved the victim from the kitchen up the stairs to Tony's bedroom. Finally, the autopsy revealed a vaginal tear and copious amounts of what appeared to be seminal fluid within the victim's vagina. She had defensive wounds to her hands, and her blouse was stained with her own blood.

Although a not guilty plea was entered for Wellons, he did not dispute his participation in the crimes. Instead, he urged the jury to return a verdict of not guilty by reason of insanity or guilty but mentally ill.

The evidence is sufficient to enable any rational trier of fact to find appellant guilty of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In keeping with our opinion in *Sabel v. State*, 248 Ga. 10, 18 (282 SE2d 61) (1981), the trial court ordered Wellons to disclose before trial the identities and reports of all experts consulted by the defense, whether or not those experts would be called to testify. Since the date of trial, we held in *Rower v. State*, 264 Ga. 323, 325 (443 SE2d 839) (1994) that the state is only entitled to discover those scientific reports which the defense intends to use at trial. Although *Rower* was decided after this case was tried, Wellons' appeal was "in the pipeline," so the *Rower* rule applies, and there was error. See *Thornton v. State*, 264 Ga. 563, 574 (449 SE2d 98) (1994). The question, therefore, is whether under the facts of this case, the error was harmful.

The state correctly notes that the defense in fact made no disclosures incompatible with the ruling in *Rower*. The defense disclosed no reports of non-testifying experts. Only one non-testifying expert was even identified, and he was never mentioned at trial.

Nevertheless, Wellons contends that he was seriously harmed by the trial court's ruling. He contends that the ruling chilled his ability to consult with mental health experts, forcing him to choose blindly between unacceptable alternatives. On the one hand, he could cooperate with an expert assessment and risk both having to disclose an unfavorable evaluation and indirect disclosure by the expert of his confidential communications about the murder. On the other hand, he could decline to cooperate with experts and risk foregoing the presen-

tation of a viable insanity or mental health defense. Wellons repeatedly urged the trial court to reverse its ruling until shortly before trial, when he finally decided to cooperate with his expert psychologist, psychiatrist and sociologist, short of discussing the murder itself, and to present a defense of insanity or mental illness. At that point, he contends that he did not have enough time to effectively prepare his mental health evidence in defense or in mitigation. He further contends that he was left without time to evaluate the viability of those defenses as contrasted with a defense of actual innocence or insufficient evidence. Finally, he contends that he suffered unfairly from his psychologist's failure to prepare a report on short notice, because at trial the state portrayed the failure to prepare a report as an effort to conceal the truth.

A thorough review of the record on appeal convinces us that Wellons' contentions have no merit. Wellons presented testimony from 17 witnesses in mitigation. Included among them were lay witnesses who testified regarding the abuse suffered by Wellons' family, and most notably by Wellons himself, at the hands of Wellons' father. They also testified to some degree of substance use or abuse by Wellons. An expert sociologist testified about the typical effects of an abusive childhood. She then testified regarding her compilation of Wellons' family history through interviews with testifying witnesses and other neighbors and relatives. Finally, Wellons' expert psychologist, who testified that he was directed by defense counsel not to reduce his report to writing, offered his conclusions based on his testing of and conversations with Wellons and on the written report of the sociologist. The psychologist testified that Wellons suffers from post-traumatic stress, a mixed personality disorder and substance abuse. He testified that Wellons does not suffer from organic brain damage and is not psychotic. He further acknowledged in his testimony that Wellons was also evaluated by a court-appointed psychiatrist, who concluded that Wellons is an intelligent, well-educated man with a significant personality disorder but no brain damage and no psychosis.

Although Wellons presented no expert testimony in the guilt-innocence phase of trial, the evidence as a whole demonstrates that his defenses of insanity and mental illness were simply not viable. See *Bright v. State*, 265 Ga. .265, 273-274 (455 SE2d 37) (1995) (greater showing of mental health problems than in present case held inadequate even to entitle defendant to expert assistance in guilt-innocence phase). Nor did Wellons have a viable alternate defense of actual innocence or insufficient evidence. The evidence of guilt was overwhelming. Therefore, the error, though it might well have initially had a chilling effect on consultation with experts, was ultimately harmless. The chilling effect could have been and apparently was cured after Wellons decided to raise the insanity defense. His counsel

made an intelligent, strategic choice not to contest Wellons' participation in the crimes, to merely introduce the idea of mental illness in the guilt-innocence phase of trial, and then to bring every effort to bear in mitigation.

3. The state exercised its peremptory strikes to remove from the jury three of the four African Americans on the panel, citing as a reason for each of the strikes that the potential juror was weak on the death penalty. Wellons contends that the state's reasons are pretextual and that the state engaged in purposeful discrimination against African American jurors. See *Batson v. Kentucky*, 476 U. S. 79, 97-98 (106 SC 1712, 90 LE2d 69) (1986). He argues that the state's discriminatory intent is evident upon a review of the entire voir dire of each of the stricken jurors — none of whom expressed more than slight reservations about the death penalty — in conjunction with the voir dire of white jurors who were not stricken and who were at least as reticent to impose the death penalty.

The trial court's determination that Wellons failed to establish purposeful discrimination was not clearly erroneous. See *Lingo v. State*, 263 Ga. 664, 666 (437 SE2d 463) (1993). The prosecutor presented "concrete, tangible, race-neutral and neutrally-applied" reasons for the strikes sufficient to overcome Wellons' prima facie case of discrimination. See id. Two of the three stricken black jurors expressed some reservations about the death penalty, and the prosecution contemporaneously noted on the record the apparent reticence of the third, who hesitated in her answers on the subject. Each of the white jurors who expressed slight reservations about the death penalty and who were not stricken also expressed moderate to strong reservations about a mental health defense. Therefore, on balance, those jurors were more favorable for the state than for the defense.

4. Wellons contends that the trial court erred in failing to excuse for cause seven potential jurors who stated that death would be the appropriate penalty for murder. Read as a whole, the voir dire of each of the prospective jurors supports the trial court's finding that the juror could serve impartially and consider both the evidence in mitigation and the trial court's instructions. See *Mobley v. State*, 265 Ga. 292, 295 (455 SE2d 61) (1995). Therefore, we find no error.

5. Wellons next maintains that the court erroneously excluded for cause five potential jurors who expressed reservations about imposing the death penalty. Read as a whole, however, the voir dire of each juror established that her views on capital punishment would have prevented or substantially impaired the performance of her duties in accordance with her instructions and oath. *Alderman v. State*, 254 Ga. 206, 207 (327 SE2d 168) (1985).

6. (a) Wellons contends that the trial court erred in failing to excuse for cause the following prospective jurors: (1) one whose son

was killed in a vehicular homicide which was the subject of ongoing prosecution by the district attorney's office; (2) a forensic expert with the State Crime Lab who has testified as an expert for the prosecution in Georgia in 900 to 1,000 cases and who was acquainted with various witnesses; (3) a prospective juror whose sister was a murder victim and who stated that he is more callous than he used to be; and (4) two prospective jurors who expressed qualms about a mental health defense.

We find no error. The decision to strike a juror for cause lies in the sound discretion of the trial court. See *Garland v. State*, 263 Ga. 495, 496 (435 SE2d 431) (1993). The court did not abuse its discretion with respect to any of the five jurors, whose voir dire shows that none of them held opinions or biases which were so fixed that they could not be set aside to decide the case on the evidence. Id.

(b) The trial court did not err in excusing for cause a Korean American prospective juror with evident difficulty speaking and understanding English. See *Bennett v. State*, 262 Ga. 149, 151 (414 SE2d 218) (1992). The prospective juror said herself that she would not be able to follow all of the testimony at trial nor to understand each of her fellow jurors during deliberations.

7. Wellons contends that Cole's eyewitness identification of him, described above, was the unreliable product of unduly suggestive procedures, creating a substantial risk of misidentification at trial, and that therefore it should not have been admitted. Wellons further contends that the district attorney was involved in the suggestive procedure and therefore had a conflict of interest as prosecutor and witness. He argues that, because the defense was unable to call the district attorney to testify, a new trial is mandated.

We find no error. First, the district attorney stated in his place at a hearing that he was not involved in the identification procedure, and the testimony of Cole supports that recollection. Second, the identification procedure was sufficiently reliable. Cole had an opportunity to view Wellons at close range in broad daylight at the time he saw Wellons carrying the sheet; Cole was a retired military police officer with 25 years of experience who paid close attention when he returned to the scene in his car specifically to get a second view of the person he had seen carrying the victim's body; he had given an accurate description of Wellons, including his skin tone, approximate height and build, and had seen Wellons again near the apartment complex before the identification at issue; only a short time had passed between Cole's earlier sightings of Wellons and the identification; and Cole stated at the scene and at trial that he was 75 to 80 percent certain Wellons was the same man he had seen with the sheet. See *Manson v. Braithwaite*, 432 U. S. 98, 113-116 (97 SC 2243, 53 LE2d 140) (1977). Furthermore, there is no evidence that Cole was

coerced to make the identification. See *Manson*, 432 U. S. at 116. Significantly, Cole had already excluded two other individuals as possible suspects. Under all of these circumstances, we cannot find "a very substantial likelihood of irreparable misidentification." See id., citing *Simmons v. United States*, 390 U. S. 377, 384 (88 SC 967, 19 LE2d 1247) (1968). It was therefore for the jury to decide the weight to be accorded to the testimony. See *Manson*, 432 U. S. at 116.

8. There is no merit to Wellons' contention that the prosecutor falsely argued that the victim was tortured prior to death. The evidence supports the conclusion that Wellons, a large, 34-year-old man, raped the 15-year-old victim, cut her, strangled her with a ligature and ultimately crushed her throat with his hands, and that she struggled to free herself. This clearly constitutes torture. See *Hill v. State*, 246 Ga. 402, 409-410 (271 SE2d 802) (1980); *Hance v. State*, 245 Ga. 856, 861 (268 SE2d 339) (1980).

9. The prosecutor did not improperly interject victim impact evidence in either phase of trial. The age of the victim was relevant and thus an appropriate subject for comment by the prosecutor. See *Smith v. State*, 255 Ga. 685, 686 (341 SE2d 451) (1986). In particular, in the sentencing phase, her young age could be considered in the jury's determination whether Wellons acted with a depraved mind. See *Hance v. State*, 245 Ga. 856, 862 (268 SE2d 339) (1980). The prosecutor's characterization of the victim as a little girl was neither improper nor inaccurate. The fact that the victim was a sophomore in high school was relevant background information, because the murder occurred during the first week of the school year, the victim was abducted on her way to the school bus stop, and her school supplies were strewn at the scene of the murder and admitted into evidence. One could reasonably infer from the evidence that the murder was unprovoked, so the prosecutor's comment that the victim did nothing to deserve her death was not inappropriate. See *Fugate v. State*, 263 Ga. 260, 265 (431 SE2d 104) (1993); *Kinsman v. State*, 259 Ga. 89, 92 (376 SE2d 845) (1989). Argument that Wellons deprived the victim of life experiences and opportunities which he had enjoyed, such as dating, college, marriage and parenting, was not impermissible. See *Ledford v. State*, 264 Ga. 60, 67-68 (439 SE2d 917) (1994). The prosecutor's comment that perhaps the victim, like Wellons, could have complained about her formative years was merely an example to rebut Wellons' claim that his troubled childhood was a mitigating factor. Pleas for retribution, such as the request that the jury return "one for India," are not improper. See *Walker v. State*, 254 Ga. 149, 159 (327 SE2d 475) (1985); *Johnson v. State*, 187 Ga. App. 803, 804 (371 SE2d 419) (1988).

10. Wellons contends that the prosecutor improperly commented on Wellons' failure to testify. In closing argument in the guilt-inno-

cence phase of trial, the prosecutor said that "only two people know what went on in that apartment," and "there's only two people who can tell us how long that horror lasted."

We find no error. Reversal for prosecutorial misconduct requires a finding that the prosecutor's manifest intent was to comment on Wellons' failure to testify or that the jury would naturally and necessarily understand the remarks as a comment on Wellons' silence. See *Lobdell v. State*, 256 Ga. 769, 774-775 (353 SE2d 799) (1987). In context, the prosecutor's comments were but a small part of a summary of the evidence best understood as conceding the ambiguities therein and were unlikely to be interpreted as comments on Wellons' failure to testify. Furthermore, the trial court appropriately charged the jury that no adverse inferences were to be drawn from Wellons' silence.

11. Wellons enumerates as error various other comments made by the prosecutor in closing argument. We find no impropriety in any of the remarks. In particular, the prosecutor's comment that Saunders was a meticulous housekeeper who valued family things was relevant to Wellons' motive in ransacking her apartment and destroying items she treasured, and it was also relevant to an understanding of the evidence collected at the scene. The prosecutor's argument that Wellons' presentation of evidence about his religious beliefs was offensive and should not be considered as mitigating was a proper comment on the genuineness of a "jail-house" religious conversion, because the argument "addresses itself to the sincerity of the defendant's rehabilitation, which is a legitimate consideration on the issue of sentence." *Todd v. State*, 261 Ga. 766, 768, n. 2 (410 SE2d 725) (1991).

12. Wellons contends that the prosecutor elicited improper testimony regarding Wellons' prior difficulties with the victim without first giving notice pursuant to Uniform Superior Court Rule 31.3. Saunders testified that sometime in the weeks prior to the murder, when the victim was watching television in Saunders' apartment, Saunders saw Wellons stare at the victim with a look in his eyes and a gesture that made Saunders uncomfortable. Saunders further testified that, as a result of what she observed, she later told Wellons never to let the victim in the apartment when Saunders was not home.

Compliance with USCR 31.3 before admitting evidence of prior acts between the victim and the accused is mandatory. *Barrett v. State*, 263 Ga. 533, 535 (436 SE2d 480) (1993). We do not think that the described conduct rises to the level of a prior difficulty.[2]

13. Wellons contends that the prosecutor improperly introduced

---

[2] Even assuming arguendo that we view the evidence as a prior difficulty and that the trial court erred in admitting it absent prior notice, any such error was harmless because in light of the overwhelming evidence of Wellons' guilt, it is highly probable that admission of the evidence did not contribute to the verdict. See *Barrett*, supra.

evidence of uncharged conduct and other bad acts allegedly committed by Wellons. We disagree. In each instance, the state properly impeached Wellons' character witnesses. One of the witnesses had been a member of the campus security police force when Wellons was in college. After he testified regarding Wellons' good character, the state properly questioned whether he had knowledge of two incidents on campus involving Wellons. The witness denied personal knowledge of one incident but stated that the second incident was resolved in Wellons' favor and that the witness personally reprimanded the officer involved. Immediately following the question regarding the first incident, the trial court instructed the jury that the testimony did not establish that the incident occurred and that the question was allowed for the limited purpose of testing the witness' knowledge of Wellons' character and activities. The other witness was a deputy sheriff who testified on direct regarding Wellons' good behavior in jail. Defense counsel elicited testimony from the witness that he had no first-hand knowledge of Wellons' disciplinary problems and only knew of them from records. On cross-examination, the state properly obtained an admission from the witness that he was aware of a stack of disciplinary reports involving Wellons which had preceded the witness' employment at the jail and that he was aware that Wellons had constantly been in trouble.

When a defendant places his character in issue, the state may cross-examine character witnesses to test the extent and foundation of the witnesses' knowledge of the defendant's character. *Jones v. State*, 257 Ga. 753, 756 (363 SE2d 529) (1988). The pretrial notice requirements of OCGA § 17-10-2 did not apply. See *Christenson v. State*, 261 Ga. 80, 90-91 (402 SE2d 41) (1991). The state was required only to demonstrate, following Wellons' objections, that its questions were asked in good faith and based on reliable information that could be supported by admissible evidence. See id. The state made the requisite demonstration, so its inquiries were proper. See *Medlock v. State*, 264 Ga. 697, 698-699 (449 SE2d 596) (1994).

14. Having found no prosecutorial misconduct, we reject Wellons' contention that the cumulative effect of prosecutorial misconduct requires reversal.

15. The trial court did not improperly restrict defense counsel's voir dire of prospective jurors. Presented with Wellons' pretrial motion requesting the latitude to pose questions regarding a variety of issues, the trial court merely applied settled principles of law.

16. The trial court did not err in failing to instruct the jury in the guilt-innocence phase on delusional compulsion. There was no evidence in the record to support such a charge, and the defense never suggested at any time during the trial that Wellons acted upon a delusional compulsion. Nor did the court err in failing to give Wellons'

requested charge on voluntary intoxication. Voluntary intoxication is a defense only when such intoxication has caused more than a temporary alteration of brain function which negates intent. *Horton v. State*, 258 Ga. 489, 491 (371 SE2d 384) (1988). The only evidence of intoxication was that Wellons appeared with a cup of wine when police were conducting their investigation hours after the murder and that Wellons had been drinking the night before the murder. There was no evidence of altered brain function.

17. Wellons contends that the court improperly charged on reasonable doubt, reducing the burden of proof on the prosecution. The court stated that "moral and reasonable certainty is all that can be expected in a legal investigation" and that "a reasonable doubt is a doubt for which a reason can be given." Because the charge as a whole accurately conveyed the concept of reasonable doubt, we find no error. See *Armstrong v. State*, 265 Ga. 18, 19 (453 SE2d 442) (1995).

18. Wellons contends that the trial judge should have recused herself because she and the bailiffs allegedly had improper communications with jurors. Wellons supports his allegations solely with affidavits of defense counsel relating hearsay regarding post-trial interviews with jurors. He contends first that the judge spoke with the jurors in a restaurant on one occasion and second that, at or before the close of the sentencing phase, jurors presented the judge and a bailiff with gag gifts.

We find no error. Upon being presented with a motion for recusal pursuant to Uniform Superior Court Rule 25.1, it is the duty of the trial judge to determine whether, assuming the truth of any of the facts alleged, a reasonable person might conclude that the judge harbors a bias, stemming from an extrajudicial source, which is of such a nature and intensity that it would impede the exercise of impartial judgment. *Birt v. State*, 256 Ga. 483, 485-486 (350 SE2d 241) (1986). Assuming that the trial judge in fact encountered and spoke to the jurors in a restaurant and that she and a bailiff were the passive recipients of gag gifts, there was no basis for concluding that judicial bias existed.

19. Wellons next contends that the trial judge should have recused herself because she allegedly displayed emotion in the presence of the jury during the state's closing argument in the penalty phase. This allegation was supported solely by the affidavit of trial counsel regarding his personal observations during trial. Pursuant to USCR 25.1, motions to recuse must be filed "not later than five days after the affiant first learned of the alleged grounds for disqualification." Wellons' motion was filed several months after trial. Therefore, the trial court properly found that Wellons failed to satisfy the time requirement or to show good cause for such failure, and denial of the

motion to recuse was proper. See USCR 25.3; *Pope v. State,* 257 Ga. 32, 35 (354 SE2d 429) (1987).

20. There is no merit to Wellons' contention that the trial judge erred in failing to disqualify herself from presiding over the motion for new trial after Wellons gave notice that she would be a witness regarding the issues involved in the motion to recuse.

21. The trial court did not err in failing to instruct the jurors that they should assume that a life sentence means imprisonment for one's natural life. OCGA § 17-10-31.1 (d) was not applicable to this case. Nevertheless, the trial court did charge language virtually identical to that requested by Wellons.

22. The trial court did not err in failing to give all of Wellons' requested jury instructions verbatim in the sentencing phase. Each principle of law was substantially covered by the court's pattern charges. See *Hawkins v. State,* 262 Ga. 193 (415 SE2d 636) (1992).

23. The trial court did not err in charging the jury that its sentencing verdict had to be unanimous while failing to charge that findings as to mitigating circumstances need not be unanimous. The court clearly charged that it was not necessary for the jury to find any mitigating circumstances to impose a life sentence. See *Ledford v. State,* 264 Ga. at 69.

24. Wellons contends that the trial court's instructions on the statutory aggravating circumstances were unconstitutionally vague and unsupported by the facts. We disagree. The evidence amply supports the court's charges on, and the jury's findings of, the following aggravating circumstances: that Wellons committed the murder while engaged in the commission of another capital felony, rape, OCGA § 17-10-30 (b) (2); that Wellons committed the murder while engaged in the commission of another capital felony, kidnapping with bodily injury, id.; and that the murder was wantonly vile and horrible in that it involved torture and depravity of mind, OCGA § 17-10-30 (b) (7). That the jury had convicted Wellons of rape in the guilt-innocence phase did not prevent its finding of rape as an aggravating circumstance for the crime of murder. See *Jefferson v. State,* 256 Ga. 821, 829 (353 SE2d 468) (1987). The state's decision not to indict Wellons for kidnapping did not prevent use of that offense as a statutory aggravating circumstance. See *Skipper v. State,* 257 Ga. 802, 807 (364 SE2d 835) (1988). Nothing prevented the jury from finding two aggravating circumstances under OCGA § 17-10-30 (b) (2). See *Lynd v. State,* 262 Ga. 58, 59-60 (414 SE2d 5) (1992). Finally, the court adequately guided the jury's discretion with respect to the (b) (7) aggravating circumstance.

25. The trial court did not err in excluding evidence that Wellons offered to plead guilty in exchange for two life sentences and that in other cases in Cobb County the state has accepted such a plea. See

*Mobley v. State*, 265 Ga. at 300; *Jones v. State*, 263 Ga. 904, 905 (440 SE2d 161) (1994).

26. Wellons' contention that the trial court erred in refusing to suppress evidence seized from his residence lacks merit. Probable cause clearly existed for the issuance of the warrant to search Saunders' apartment. Furthermore, Saunders, the sole lessee of the apartment who shared a room with Wellons, voluntarily consented to the search orally and in writing. See *Hall v. State*, 239 Ga. 832, 833 (238 SE2d 912) (1977).

27. The trial court did not err in permitting the jury to view a videotape of the crime scene. See *Foster v. State*, 258 Ga. 736, 740 (374 SE2d 188) (1988). The videotape was relevant to show the location of the body in relation to various evidence and to the scene of the murder, the extent to which Wellons had concealed the body from view, and the relationship of various items of evidence inside the apartment. Therefore, it was clearly probative of central issues, including intent, Wellons' mental state, kidnapping and the reliability of Cole's identification of Wellons.

28. OCGA § 15-12-40, which prior to its recent amendment required the jury commission initially to compose the grand and petit jury lists from the official registered voters list of the county, did not unconstitutionally discriminate against historically underrepresented groups, because it provided for supplementation of the lists from other sources if necessary to achieve a fairly representative cross-section of the citizens of the county. Wellons has failed to show support for his contention that young adults, women, poor people and minorities were in fact underrepresented on the grand or petit juries.

29. Wellons contends that the computer selection of the petit jury pool was manipulated in a manner that resulted in discrimination against certain groups. First, he contends, but failed to show, that the method of selection excluded a segment of young people, and of people within certain other age ranges, because the computer selected only persons whose years of birth ended in a specific number or numbers. Even if Wellons' contention were true, he has failed to make out a prima facie case of jury discrimination, because he has not shown that the excluded age groups are distinct and cognizable. See *Larmon v. State*, 256 Ga. 228, 230 (345 SE2d 587) (1986); *Berryhill v. State*, 249 Ga. 442, 445 (291 SE2d 685) (1982). Furthermore, young people are not a constitutionally highly protected class, and their underrepresentation does not invoke a high standard of judicial review. *Parks v. State*, 254 Ga. 403, 411 (330 SE2d 686) (1985). Second, Wellons complains that computer selection was manipulated by disproportionately drawing African Americans from the list of registered voters until their representation on the petit jury list equalled that in the general population. He contends that this procedure failed to pro-

duce a fair cross-section of the county. In *Sears v. State*, 262 Ga. 805, 806 (426 SE2d 553) (1993), we rejected the argument that this method of creating a "forced list" is constitutionally infirm. Wellons has failed to show a level of disparity which would necessitate a result different from that in *Sears*.

30. There is no merit to Wellons' contention that the death penalty scheme is unconstitutional because the district attorney has unfettered discretion. See *McMichen v. State*, 265 Ga. 598, 611 (458 SE2d 833) (1995). The law authorized the state to seek the death penalty in this case, and Wellons' claim that the decision to do so was racially motivated is purely speculative, particularly given that the victim was also African American. See *Rower v. State*, 264 Ga. at 323.

31. The method by which this Court reviews the proportionality of death sentences is constitutionally sound. *McMichen*, 265 Ga. at 611.

32. Electrocution is not cruel and unusual punishment. Id.

33. The Unified Appeal Procedure is not unconstitutional. *Ledford v. State*, 264 Ga. at 65.

34. The provisions of the Unified Appeal and OCGA § 17-10-35 (a) providing for a report of the trial court in death penalty cases are not unconstitutional. *McMichen*, 265 Ga. at 613.

35. Wellons enumerates as error the overruling of numerous defense objections throughout trial. Having thoroughly reviewed the entire record and carefully considered each of the enumerated rulings, we find no error.

36. Wellons' claim that the presence of the media denied him effective assistance of counsel, a fair trial and the opportunity to effectively confront and cross-examine witnesses is unsupported in the record.

37. We do not find that Wellons' death sentence was imposed under the influence of passion, prejudice or other arbitrary factor. See OCGA § 17-10-35 (c) (1). The death sentence is not excessive or disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. The similar cases listed in the Appendix support the imposition of the death sentence in this case.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Brown v. State*, 261 Ga. 66 (401 SE2d 492) (1991); *Morrison v. State*, 258 Ga. 683 (373 SE2d 506) (1988); *Pruitt v. State*, 258 Ga. 583 (373 SE2d 192) (1988); *Williams v. State*, 258 Ga. 281 (368 SE2d 742) (1988); *Crawford v. State*, 257 Ga. 681 (362 SE2d 201) (1987); *Parker v. State*, 256 Ga. 543 (350 SE2d 570) (1986); *Devier v. State*, 253 Ga. 604 (323 SE2d 150) (1984); *Felker v. State*, 252 Ga. 351 (314 SE2d

621) (1984).

DECIDED NOVEMBER 20, 1995 —
RECONSIDERATION DENIED DECEMBER 15, 1995.

*Jones & Heard, Derek H. Jones,* for appellant.
*Thomas J. Charron, District Attorney, Jack E. Mallard, Debra H. Bernes, Nancy I. Jordan, Assistant District Attorneys, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Marla-Deen Brooks, Assistant Attorney General,* for appellee.