A08A1192. OVERTON v. THE STATE.
A08A1193. DUDLEY v. THE STATE
A08A1194, A08A1717. COLEMAN v. THE STATE (two cases).
(671 SE2d 507)

BARNES, Chief Judge.

Initially eight defendants were charged with the offenses leading to these appeals. Two defendants were granted new trials, one is a fugitive, and one pled guilty and testified against the other defendants. The remaining four defendants are appealing their convictions. Because their convictions arise from the same general factual allegations, they were tried and convicted jointly, and they generally assert the same enumerations of error, we have consolidated their four appeals for disposition.

The indictments alleged that Ronald Coleman, Jr., and Carlston Coleman, Jr., abducted an assistant manager of a Sam's Club against his will and the kidnapping resulted in the victim's death. They were

also charged with entering a Sam's Club with the intent to commit a theft, committing a theft by taking money from the victim through the use of force, a handgun, and hijacking the victim's car. No defendant was charged with murder.

The Racketeer Influenced and Corrupt Organizations Act ("RICO")[1] indictment alleged that Ronnie Overton, Carlston Coleman, Ronald Coleman, Kendric Dudley and others conspired to develop and execute a pattern of criminal activity motivated by, and the effect of which was, pecuniary gain, physical injury, and murder. In furtherance of this plan the defendants engaged in theft by receiving motor vehicles, forging and uttering checks, conspiring to commit forgery and possessing stolen checks, deposit slips, identification data, and tools to create false identification, stealing from Sam's Club stores, violating the Georgia Controlled Substances Act and the laws of South Carolina by possessing marijuana with the intent to distribute, soliciting murder, falsely imprisoning the persons they intended to murder, concealing the deaths of the victims by burning their bodies in the trunks of stolen cars, committing arson in the third degree, conspiring to file false federal income tax returns, and filing false claims with the Internal Revenue Service.

After a trial lasting approximately two months, all the defendants were found guilty as charged. Carlston Winslow Coleman, in Case No. A08A1194, and Ronald Coleman, in Case No. A08A1717, challenge their convictions for kidnapping with bodily injury resulting in death, burglary, armed robbery, hijacking a motor vehicle, possession of a firearm or knife during the commission of a felony and violating the RICO Act. Ronnie Overton in Case No. A08A1192 and Kendric Dudley, in Case No. A08A1193, appeal their convictions for violating the RICO Act, the only offense with which they were charged.

Although sometimes phrased differently, the appellants contend generally that the trial court erred by failing to sever offenses and failing to sever their cases from each others' cases, by denying a *Batson* challenge, by refusing to excuse for cause a juror with a fixed opinion about the case and a non-English speaking juror, and by allowing the State to introduce gruesome and prejudicially inflammatory photographs of the victims. They also contend the State failed to prove the predicate acts they allegedly committed and the RICO prosecution was flawed because disparate crimes were joined. They further contend that the evidence was insufficient to sustain the verdicts and that the trial court erred by admitting certain witness statements into evidence, and by denying their motion for a

---

[1] OCGA § 16-14-4.

mistrial based on the State's failure to disclose exculpatory evidence and argument involving matters not in evidence.

Carlston Coleman contends the trial court erred by admitting a statement he gave because it was not voluntary. Ronald Coleman also contends the trial court erred by violating his right to confront the witnesses against him, and by denying a mistrial or refusing to give curative instructions.

During the trial, the trial court granted a defense motion to allow counsel for all the defendants to adopt all objections and motions made during the course of the trial, unless a defendant specifically opted out of a particular objection or motion. The trial court also had a policy of not requiring contemporaneous objections.

Finding no reversible error, we affirm the convictions of all the appellants.

1. All appellants contest the sufficiency of the evidence to sustain their convictions. "When evaluating the sufficiency of evidence, the proper standard for review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979)." *Dean v. State*, 273 Ga. 806, 806-807 (1) (546 SE2d 499) (2001). We review the evidence in the light most favorable to the verdict, giving deference to the jury's determination on the proper weight and credibility to be given the evidence. Id. at 807 (1). It is the function of the jury, not this Court, to assess the credibility of the witnesses, to resolve any conflicting evidence, and to determine the facts. *Butler v. State*, 273 Ga. 380, 382 (1) (541 SE2d 653) (2001). Issues related to the credibility of witnesses are "solely . . . matter[s] to be resolved by the jury. [Cit.]" *Hawkins v. State*, 254 Ga. App. 868, 869 (563 SE2d 926) (2002).

The State alleged that all of the defendants engaged in a pattern of criminal conduct for monetary gain that began in 1994, and included car thefts, forgery, income tax fraud, drug sales and possession, kidnapping, and other crimes. Ronald Coleman and Carlston Coleman were also charged with additional crimes, including soliciting murder, kidnapping, theft by force, and hijacking a car. Viewed in the light most favorable to the jury's verdict, the evidence shows that Ronald Coleman and Carlston Coleman were convicted of filing false income tax returns and falsifying W-2 forms in 1994. Also, in 1994, a woman's Buick Riviera was stolen from her yard in Augusta. After she saw the car being driven by her house several times, she stopped the car on a pretext to see if it was hers and Ronald Coleman was driving. On another occasion the police stopped

VALE LAW LIBRARY

the car while it was being driven by Jarman Harold[2] who said he borrowed the car from Ronald Coleman. The car was again stopped by the police who were investigating a stolen check incident involving a young woman with a child. After the woman was arrested, she turned the child over to Ronald Coleman. Ronald Coleman was ultimately prosecuted and pled guilty for theft by receiving of the car and possessing a car with an altered identification number.

In 1995, two automobiles that had been stolen from a dealer in South Carolina were recovered from Ronald Coleman and stolen checkbooks and deposit slips, laminating pouches, scissors and other items were recovered from his residence. Ronald Coleman pled guilty to stealing the cars.

In 1997, Ronald Coleman was found with marijuana in his pocket while he was a passenger in a car pulled over by the police in South Carolina, and 4.7 pounds of marijuana also were found in the car. Ronald Coleman pled guilty to possessing the marijuana.

Also in 1997, Ronald Coleman met with John Travis, also known as "Squeaky," in DeKalb County, Georgia, to buy more marijuana to sell and use the money to pay back "the Jamaicans," who had supplied him with the marijuana confiscated in South Carolina, but during the meeting Coleman was robbed. Because he believed that Bernard Arroyo had set up the robbery, Coleman planned to gain revenge on him. Arroyo and another man, Ryan Singh, were lured to an apartment where they were brutally beaten. The men were then wrapped in blankets, put in the trunk of a car, and taken to Thomson, Georgia, where they were put in the trunk of a recently stolen car and shot in the head with the same pistol. The car was then set on fire.

A deputy sheriff found a burned car in some woods in Warren County, Georgia. Two bodies in the trunk were identified through fingerprint and dental records as Arroyo and Singh. Autopsies disclosed skull fractures caused by bullets and multiple blunt force trauma showing that the men had been beaten before their deaths.

The Georgia Bureau of Investigation (GBI) agent investigating the deaths found that the burned car had been stolen from an apartment complex in Thomson, Georgia. After the victims' families reported them missing, the GBI agent learned that Arroyo had been living in an apartment in Augusta with Ronald Coleman. When he was interviewed, Coleman told the agent that Arroyo had introduced him to some Jamaicans who became his suppliers for marijuana, and who became angry with him over the marijuana confiscated in

---

[2] Harold was one of the defendants in this case, but he was granted a new trial on his RICO conviction and he pled guilty to lesser offenses.

South Carolina. He suggested to the agent that the Jamaicans may have been involved in the deaths of Arroyo and Singh.

Also in 1997, the Secret Service contacted the Richmond County Sheriff's Department about counterfeit bills that had been passed in a local store. The person passing the bills identified Carlston Coleman as the one who provided her with them. When the authorities searched Carlston Coleman's apartment, Ronald Coleman was present, and the authorities found a counterfeit bill with the same serial number as the bill passed in Richmond County, as well as a professional paper trimmer, a paper cutter, checkbooks with different names, and some marijuana. Carlston Coleman was interviewed by the GBI and told the agent that he had heard that Charles Winters[3] and "Squeaky" had been robbed by some Jamaicans and he believed that Ronald Coleman was there.

In November 1997, the GBI agent received information from Virgil Rogers that Ronald Coleman told him in July that he had been tied up and robbed in Atlanta with Winters, that he believed he was set up by a white guy named "B," that he lost a significant amount of money in the robbery, and that he was planning to get it back. Ronald Coleman later told Rogers that the two men he believed responsible for his robbery were dead; they had been killed and their bodies wrapped in a rug and burned in the trunk of a car in Warren County, Georgia. He also said Harold had stolen that car and driven it to Warren County.

In 1998, the GBI agent interviewed Antonio Tillery, who had been arrested in Norfolk, Virginia, for several armed robberies. Tillery told Virginia police that he wanted to give information about two men who had been murdered in Warren County, Georgia, in July 1997. Tillery said that he was present with Harold, Dudley, Overton, and Carlston Coleman in Coleman's apartment when "Squeaky" talked about the robbery in Atlanta. He could not recall if Ronald Coleman was part of the conversation. The group believed that Arroyo and Singh were responsible for the robbery. Tillery believed that Squeaky and Dudley said something about killing Arroyo and Singh and produced a pistol. Harold came up with the plan to steal a car and drive them to Warren County. The next day Rogers had a telephone conversation with Overton, who said they had caught Arroyo and Singh and took them to a woman's apartment where they were beaten. According to Tillery, Overton told him that when he arrived the two men were tied up and their faces were "swole up,

---

[3] Winters was also one of the defendants in this case but was granted a new trial on his RICO conviction.

bloodied, cut up." Overton said Squeaky came in and put salt in their mouths and rubbed salt on their faces. When Carlston Coleman's father, Carlston Coleman, Sr., was interviewed he suggested that Arroyo and Singh were murdered in retaliation for the robbery.

The GBI agent also testified about the extensive telephone calls during that period of time between the apartment where Arroyo and Singh were beaten and the service garage of Carlston Coleman, Sr., in Thomson, Georgia.

Regarding the robbery of a Sam's Club and the kidnapping and murder of David Holt, the evidence showed that David Easterling, who pled guilty to two other murders in South Carolina and to participating in the robbery and Holt's abduction, heard Ronald and Carlston Coleman discussing their plans to pull a "lick" at Sam's Club. According to Easterling, at about 9:30 to 10:00 p.m. on June 21, 1998, Carlston Coleman came to his apartment and with a gun forced him to drive Ronald and Carlston Coleman to a location across the road from Sam's Club. Easterling parked there, gave the keys to Carlston Coleman, and waited for about an hour to an hour and a half.

Easterling testified that Ronald Coleman rode with him as he then followed Carlston Coleman, who was driving another car. After stopping to pick up Ronald Coleman's car, they went to a gas station and bought a red plastic gas can. Easterling followed the others to South Carolina where he saw something glowing and smoke from a fire on the other side of the river. He saw Carlston Coleman running away from the fire, carrying a gym bag. Carlston Coleman then took Easterling back to his apartment.

A witness testified that in the early morning hours of June 21, 1998, he saw smoke on the South Carolina side of the bridge. When he saw a car in flames, he called the police and fire department. The authorities discovered that the car was registered to David and Donna Holt. The body of David Holt was in the trunk of the car which had been set on fire with gasoline. The body in the trunk was identified as that of David Holt.

An autopsy revealed that Holt was alive when the car burned. Soot was in his nostrils, airways, and lungs, and he died from carbon monoxide poisoning and external burns. While at the scene, the police received a report to be on the lookout for Holt and the car in which his body was found. Sam's Club employees had reported they found the store doors open, the office unsecured and in disarray, and currency bags scattered about. Holt, who was the manager on duty, and his car were missing. The store's safe was open and approximately $63,000 was missing, as were video surveillance tapes for June 19 and 20. The alarm code activity showed that Holt had locked

the store and set the alarm at 12:05 a.m. on June 20, 1998. Then, at 1:28 a.m., his code was used to reopen the store.

The investigation revealed that Lavern Ellis was suspected of working with Carlston Coleman in stealing from the store. This information was consistent with information from a witness who reported that while he was checking out of Sam's Club on June 19 he saw three men enter the store through an exit door. One of the men made a motion to a female cashier and then walked with the others into a public restroom rather than into the merchandise area of the store. The witness identified Ellis as the cashier and Carlston Coleman as one of the three men.

Ellis was named a defendant in the RICO indictment, but then pled guilty to theft and forgery, two of the predicate offenses to the RICO charge. Cooperating with the State, she testified that, in return for $300, she provided information about a church in Jacksonville, Florida, to Carlston Coleman that he used to buy three computers with a fictitious check. She also testified that she gave Carlston Coleman extensive information about the store's internal operations. During the trial, her prior statement was read to the jury after she had been released as a witness.

A bartender in Augusta, Georgia, testified that she knew Carlston Coleman because he was dating her sister. She was at the bar the night that news about Holt's death was broadcast, and Carlston Coleman was seated nearby. When he heard the report, Coleman said, "They'll be a f--king fool if they think they'll catch my ass." Then he said, "I hope they don't catch them son of bitches, because the money's going to be good." The witness immediately recalled all the money Coleman had been spending on her sister, buying "outrageous items."

The bartender's daughter recalled being outside of Carlston Coleman's apartment when he drove up and gave another man something black, "like a mask or gloves" to take around the corner and throw in the dumpster. When she went in Coleman's apartment, she saw him and four other men with money, a gun, and envelopes with zippers, "like a bank envelope." They were dividing the money which was in "green Army bags." Carlston Coleman said he had robbed somebody and was passing out $100 bills.

Another witness testified that in July, Carlston Coleman and others were discussing hiding someone because the Federal Bureau of Investigation wanted to talk to her. Someone with Coleman said that if he did not do anything, he had nothing to worry about, but he replied that he had been driving and his partners were the ones that had "done it."

In October 1998, a Richmond County deputy sheriff stopped a car Ronald Coleman was driving. Although Coleman avoided appre-

hension by fleeing on foot, a search of the car revealed his driver's license, stolen checks, social security cards, a fictitious South Carolina identification card, and $935 in cash. Ronald Coleman also was identified in the investigation of an attempt to pass a bad U-Haul check in Macon, Georgia, after he gave a false name. A search of the car he was driving uncovered 30 other fake U-Haul checks.

(a) *Ronald Coleman and Carlston Coleman's convictions.* The evidence was sufficient for a reasonable trier of fact to have found Ronald Coleman and Carlston Coleman guilty, beyond a reasonable doubt, of the kidnapping of Holt that resulted in his death, burglary of the Sam's Club, armed robbery, hijacking Holt's car, and the RICO violation.

(b) *Kendric Dudley's RICO conviction.* The evidence was also sufficient for a reasonable trier of fact to have found Kendric Dudley guilty beyond a reasonable doubt of the RICO violation, as it showed Dudley was involved in planning the murders of Arroyo and Singh and that he participated in the groups' other crimes alleged in the RICO indictment.

Dudley's allegation that the trial court erred by denying his motion for a directed verdict of acquittal because the State did not prove that he had engaged in a pattern of racketeering, is also without merit. OCGA § 16-14-3 (8) (A) and (9) (A), (B) define a pattern of racketeering as

> [e]ngaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such acts occurred after July 1, 1980, and that the last of such acts occurred within four years, excluding any periods of imprisonment, after the commission of a prior act of racketeering activity,

and "racketeering activity" means

> to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime which is chargeable by indictment under the following laws of this state: [The list of crimes included the crimes alleged in the RICO indictment in this case.]

> (B) "Racketeering activity" shall also mean any act or threat involving murder, kidnapping, gambling, arson, rob-

bery, theft, receipt of stolen property, bribery, extortion, obstruction of justice, dealing in narcotic or dangerous drugs, or dealing in securities which is chargeable under the laws of the United States or any of the several states and which is punishable by imprisonment for more than one year.

A motion for a directed verdict in a criminal case should only be granted when there is no conflict in the evidence and the evidence demands a verdict of acquittal as a matter of law. OCGA § 17-9-1 (a). Based upon the evidence discussed above and the definition of racketeering activity in OCGA § 16-14-3 (8) (A) and (9) (A), (B), the trial court did not err by denying Dudley's motion for a directed verdict. The activities that Dudley engaged in were sufficiently linked to form a RICO pattern, but sufficiently distinguishable so that they were not mere single transactions. Compare *Stargate Software Intl. v. Rumph*, 224 Ga. App. 873, 878 (3) (482 SE2d 498) (1997) (taking and wrongful use of computer equipment and records a single transaction); *Raines v. State*, 219 Ga. App. 893, 894 (1) (467 SE2d 217) (1996) (sale of timber land based on false reports of value and filing a false deed on the same transaction).

(c) *Ronnie Overton's RICO conviction.* The evidence showed that Overton was present and was involved in the planning of the murders of Arroyo and Singh. Overton's statement to Tillery regarding his involvement in their beating and imprisonment and that he participated in the groups' other crimes alleged in the RICO indictment was sufficient for a reasonable trier of fact to have found him guilty beyond a reasonable doubt of the RICO violation.

Overton also alleges the State failed to prove that he committed any of the predicate acts alleged and that the RICO prosecution was flawed because it joined disparate crimes in one transaction that were not interrelated as required by OCGA § 16-14-3 (8). In *Dover v. State*, 192 Ga. App. 429, 430-431 (1) (385 SE2d 417) (1989), this court explained that

the Georgia RICO statute is narrower than the federal statute, in that OCGA § 16-14-3 [(8)] defines a "pattern of racketeering activity" as "at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents." The federal RICO statute, of course, requires a connection between the racketeering activity and the enterprise, but it does not on its face

require any interrelatedness between the predicate crimes themselves.

(Citations and punctuation omitted.) Id. *Dover* further explained that

> [b]ecause of this difference, our legislature intended to and did, by virtue of OCGA §§ 16-14-4 (a) and 16-14-3 [(8)], subject to the coverage of our RICO statute two crimes, included in the statute as designated predicate acts, which are part of the same scheme, without the added burden of showing that defendant would continue the conduct or had been guilty of like conduct before the incidents charged as a RICO violation.

Id. at 432 (1). A RICO conviction requires proof that a defendant has committed two or more offenses of the kind included in the RICO statute; the State is not required to prove all of the alleged predicate offenses. *Bethune v. State*, 198 Ga. App. 490, 491 (1) (402 SE2d 276) (1991). Overton maintains, however, that the crimes were isolated incidents, "and it is glossy paperback fiction to say that they are connected simply because the end result is an often indefinable 'gain' for the defendants." We disagree. The acts alleged met the definition of a "pattern of racketeering activity" as set forth in OCGA § 16-14-3 (8) of "at least two [incidents] of racketeering activity . . . that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents." Here, the State established a number of interrelated incidents of racketeering activity that had the same intents and results (monetary gain) and the same accomplices (the defendants and other members of the group). The evidence also established that these were not isolated incidents, but a continuing pattern of criminal activity. *Dorsey v. State*, 279 Ga. 534, 540 (2) (b) (615 SE2d 512) (2005).

Although Overton argues that Tillery's testimony should not be credited because he gave many different versions of the facts, it is solely the jury's responsibility to determine witness credibility, to resolve conflicting evidence, and to determine the facts. *Butler v. State*, supra, 273 Ga. at 382 (1); *Hawkins v. State*, supra, 254 Ga. App. at 869. This allegation of error is without merit.

2. All the appellants contend the trial court erred by allowing the State to introduce, over the defendants' objection, gruesome, highly

inflammatory, and prejudicial pre- and post-autopsy photographs of the murder victims.[4]

(a) One of the post-autopsy photographs showed the skin pulled away from the skull revealing skull fractures caused by the gunshot. Another showed a wooden dowel inserted through the brain cap through the skull. Another of the post-autopsy photographs was a color photograph of an exposed brain. The State's witness testified that the photograph depicted the path of the bullet and the associated bone fractures. The witness did not testify, however, and the State does not contend, the photograph illustrated some material fact apparent only because of the autopsy. Instead, the State contends the autopsy photographs were admissible to show the extent of their wounds and the nature of their death.

*Brown v. State*, 250 Ga. 862, 866 (5) (302 SE2d 347) (1983), announced the rule applicable to admitting photographs of crime victims.

A photograph which depicts the victim after autopsy incisions are made or after the state of the body is changed by authorities or the pathologist will not be admissible unless necessary to show some material fact which becomes apparent only because of the autopsy. A photograph which shows mutilation of a victim resulting from the crime against him may, however gruesome, have relevance to the trial of his alleged assailant. The necessary further mutilation of a body at autopsy has no such relevance and may cause confusion, if not prejudice, in the minds of jurors.

Id. at 867 (5). Further, "mid-autopsy and post-autopsy photographs are admissible only when they depict injuries or other relevant matters not otherwise apparent. [Cits.]" *Stinski v. State*, 281 Ga. 783, 785-786 (3) (642 SE2d 1) (2007).

In *McCullough v. State*, 255 Ga. 672, 672-673 (2) (341 SE2d 706) (1986), our Supreme Court reversed McCullough's conviction for the murder of his wife because the State introduced post-autopsy photographs. The court held that *Brown* requires that the photograph be "necessary" to establish a material fact that could only become apparent because of the autopsy. Because other evidence could show that McCullough strangled the victim, a post-autopsy photograph was not "necessary." Also, the post-autopsy photograph which could be used to tell the depth of stab wounds was also unnecessary

---

[4] Twenty-four photographs of Arroyo and Singh were shown to the jury.

because no connection was established between the wound's *depth* and any issue in the case.

No defendant in this case was charged with murder. No issues of self-defense, or accident, were raised by any defendant. In fact, the defendants were willing to stipulate that the two men were killed and their bodies burned to conceal the crime. The State, of course, was not obligated to accept the defendants' stipulation, but the State was obligated to comply with the mandate of *Brown*, and we find that the State has not done so.

On appeal, the State merely asserts that the post-autopsy photographs were admissible to show the nature and extent of the wounds and the cause of death. Missing from this explanation, of course, is a showing that the photographs were "necessary" to establish a material fact that could only become apparent because of the autopsy and a connection between that and some material issue at trial. *McCullough v. State*, supra, 255 Ga. at 672-673 (2).

The State's reliance on *Smith v. State*, 283 Ga. 237 (657 SE2d 523) (2008), is misplaced because the evidence in that case showed the photographs were necessary to show the full extent of the injuries, which could not be detected before the autopsy. Further, the quotation from *Roberts v. State*, 282 Ga. 548, 552 (9) (651 SE2d 689) (2007), that the State relies on concerns pre-autopsy photographs.

Accordingly, the trial court abused its discretion by admitting the photographs into evidence. In light of the overwhelming evidence of appellants' guilt, however, we are confident that the admission of the photographs was harmless error. *McClure v. State*, 278 Ga. 411, 412 (2) (603 SE2d 224) (2004).

(b) Even though introducing 24 pre-autopsy photographs appears excessive, pre-autopsy photographs are usually relevant and material to issues in the case, and are admissible even if they may inflame the jury because photographs showing the extent, location, and nature of the victim's wounds are material and relevant. *Smith v. State*, 280 Ga. 490, 492 (2) (629 SE2d 816) (2006); *Morgan v. State*, 276 Ga. 72, 76 (7) (575 SE2d 468) (2003). A trial court has broad discretion in balancing the probative and prejudicial nature of crime scene photographs. *Dean v. State*, supra, 273 Ga. at 807 (2).

3. The appellants contend the trial court erred by denying their motions to sever the offenses which were joined merely because they are of the same or similar character. *Dingler v. State*, 233 Ga. 462, 464 (211 SE2d 752) (1975). They argue that the "spillover" from the Sam's Club offenses prejudiced the jury against defendants who were only charged with the RICO violation and the Sam's Club crimes were unrelated to the RICO violation.

The State contends, however, that the trial court properly denied the defendants' motions to sever the counts of the indictments

because the evidence showed that all the offenses were part of the defendants' course of supporting themselves through criminal activity. The indictment shows that all the defendants were alleged to have "conspired among themselves and with others to develop and execute an interrelated pattern of criminal activity motived by, and the effect of which was, pecuniary gain, physical injury, and murder." They were further alleged to have committed solicitation to commit murder, false imprisonment of persons whom they intended to murder, and concealing the death of said persons after their murders, by burning their bodies in the trunk of a stolen car as part of the scheme of illegal activity. These allegations included the Sam's Club crimes.

In Georgia,

> [t]he right to severance of offenses exists only where the offenses have been joined *solely* on the ground that they are of the same or similar character. However, where they are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan, severance lies within the discretion of the trial court since the facts in each case are likely to be unique. It is clear that where separate crimes are committed in order to accomplish a single criminal purpose, the crimes are said to constitute parts of a single scheme or plan, even if they are somewhat removed from one another in terms of time and place.

(Citations and punctuation omitted.) *Bailey v. State*, 157 Ga. App. 222, 223-224 (3) (276 SE2d 843) (1981). "The test for the court to consider is whether, in light of the number of offenses charged and the complexity of the evidence, the fact-trier will be able to distinguish the evidence and apply the law intelligently to each offense." (Citation and punctuation omitted.) *Dobbs v. State*, 204 Ga. App. 83, 84 (1) (418 SE2d 443) (1992). The trial court did not err by denying the motions to sever the offenses.

4. In the same manner, the appellants also contend the trial court erred by denying their motions to sever their cases from the other defendants. They assert that the complexity of the evidence presented a danger that the jury would be confused, and that the bulk of the evidence was directed toward Ronald Coleman and Carlston Coleman because of their actions in Holt's kidnapping, robbery, and murder. Whether to grant a motion to sever the trial of some of the defendants is within the discretion of the trial court, OCGA § 17-8-4; *Freeman v. State*, 205 Ga. App. 112 (421 SE2d 308) (1992), and the appellants were required to do more than raise the possibility that a separate trial would have given them a better

chance of obtaining an acquittal. The test is whether the number of defendants will create confusion during the trial; whether the strength of the evidence against one defendant will engulf the others with a "spillover" effect; and whether the defendants' claims are antagonistic to each other's rights. *Cain v. State*, 235 Ga. 128, 129 (218 SE2d 856) (1975).

The appellants' burden was to make a clear showing of prejudice sufficient to establish a denial of due process. *Barnett v. State*, 204 Ga. App. 491, 495 (2) (b) (420 SE2d 43) (1992); *Emmett v. State*, 199 Ga. App. 650, 652 (4) (405 SE2d 707) (1991). They have not done so. Because each defendant was charged with the RICO violation, all of the evidence, including the evidence concerning the Colemans' actions toward Sam's Club manager Holt, was admissible against all the defendants, and would have been admissible even if they had separate trials on the RICO violations. We do not find that the defendants presented antagonistic defenses. Further, the fact that some of the testimony might have been stronger against some of the defendants does not demand a finding that denial of a motion to sever is an abuse of discretion. *Martin v. State*, 162 Ga. App. 703, 704 (2) (292 SE2d 864) (1982). Accordingly, the trial court did not err by denying the defendants' motion to sever some of the parties.

5. The appellants contend the trial court erred by allowing the State to introduce out-of-court statements made by Rogers, Tillery, Ellis, and Brenda Lyons. They contend that Rogers' and Lyons' credibility had not been challenged within the meaning of *Woodard v. State*, 269 Ga. 317, 320 (2) (496 SE2d 896) (1998), because the witnesses' veracity was not placed in issue during cross-examination by affirmative charges of recent fabrication, improper influence, or improper motive. Id. The appellants also contend that they were deprived of their right to confront the witnesses against them because federal grand jury testimony was read to the jury after the witnesses were excused, and because the federal grand jury testimony of other witnesses went beyond the scope of the direct and cross-examination of the witnesses. Carlston Coleman also contends that the testimony of Rogers and Tillery placed his character in issue.

The prior consistent statements were admissible because all the witnesses testified during the trial and were subjected to cross-examination in which their credibility was challenged. *Warren v. State*, 283 Ga. 42, 43 (3) (656 SE2d 803) (2008). Further, some of the statements were admissible as prior *inconsistent* statements because the statements were inconsistent with the witnesses' trial testimony, see *Gibbons v. State*, 248 Ga. 858 (286 SE2d 717) (1982), and in some instances the prior statements were admissible under the rule of

completeness,[5] because the defense had introduced parts of the witnesses' grand jury testimony.

If a hearsay declarant is present at trial and subject to unrestricted cross-examination, a defendant's right of cross-examination is satisfied, and the witnesses' prior out-of-court statements are not hearsay under OCGA § 24-3-1 because the declarant is available for cross-examination, and the evidence does not rest upon the credibility of other persons. *Cuzzort v. State*, 254 Ga. 745 (334 SE2d 661) (1985). "[T]he concerns of the rule against hearsay are satisfied [when] the witness whose veracity is at issue is present at trial, under oath, and subject to cross-examination." *Carroll v. State*, 261 Ga. 553, 554 (1) (408 SE2d 412) (1991). *Crawford v. Washington*, 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004), does not demand a different result because when a witness appears at trial for cross-examination, the confrontation clause places no constraints on the use of the witness' prior testimonial statements.

We find no error regarding these witnesses because their veracity had been attacked during cross-examination, they were present, testified under oath, and were subject to cross-examination. The fact that the witnesses were discharged before their out-of-court statements were presented to the jury does not alter this result. If the appellants desired that the witnesses remain available they should have taken measures to have them retained.

Rogers' grand jury testimony was permitted under the co-conspirator exception. See OCGA § 24-3-5 ("After the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all."). Thereafter, Dudley subpoenaed Rogers into court and cross-examined him. Dudley contends that this was error because the court allowed Rogers' grand jury testimony to be read without evaluating his reliability under *Smith v. State*, 253 Ga. App. 131, 134 (2) (b) (558 SE2d 455) (2001). Dudley challenges the hearsay testimony of Tillery on the same basis, and also contends the trial court erred by allowing the GBI agent to testify about what Winters told him that Diane Wilson said and by allowing the agent to testify about Nzana Foster's statements to the agent. These allegations are without merit. As far as Overton is concerned, Rogers' grand jury testimony did not mention him, and thus he could not have been prejudiced by it and has no standing to complain. *Rogers v. State*, 211 Ga. App. 67, 68 (1) (438 SE2d 140) (1993). Moreover, Ronald Coleman's complaint that these witnesses placed his character in issue is

---

[5] See OCGA § 24-2-4: "Where either party introduces part of a document or record, the opposite party may read so much of the balance as is relevant."

238

without merit. Material and relevant evidence is not inadmissible because it incidentally places the defendant's character in issue. *Wood v. State*, 279 Ga. 667, 670 (2) (620 SE2d 348) (2005).

6. Ronald Coleman contends his conviction should be reversed because the State did not provide him with exculpatory evidence regarding statements that Easterling made implicating others in the Sam's Club crimes. See *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). Coleman alleges that Easterling made these allegations in another case that was being prosecuted by the same district attorney's office that prosecuted him and that Easterling's statements were in the case file of that case. *Brady* does not require the prosecution to open its files for general inspection by the defense or for pretrial discovery, and it does not entitle the defense to a fishing expedition in the State's files. *Boatright v. State*, 192 Ga. App. 112, 113 (2) (385 SE2d 298) (1989). Further, *Brady* is not violated if the material in question is provided during trial, and Coleman states in his brief that Easterling's statement was available to him during the trial. *Glenn v. State*, 255 Ga. 533, 534 (2) (340 SE2d 609) (1986). Accordingly, there was no *Brady* violation. We do not find *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972), applicable because Ronald Coleman is not complaining that the State failed to inform him of an agreement between the State and the witness regarding his testimony.

7. Ronald Coleman alleges the trial court erred by denying his motion for a mistrial because Easterling, while testifying about the abduction and murder of Holt, improperly injected his character in issue by saying, in front of the jury, "these guys are killers." The State agrees that the reference to "killers" in this comment should not have been made, but contends the statement did not place the appellants' character in issue because it did not concern other transactions, see OCGA § 24-2-2, and that any error was harmless.[6] Pretermitting whether error was committed, we find that in the context of this case, any error was harmless.

8. The appellants contend the trial court erred by denying their motion for a mistrial after the prosecutor argued facts from an exhibit that had not been introduced in evidence. A GBI agent had interviewed Carlston Coleman's father and had surreptitiously recorded the interview. Based upon this recorded interview, the prosecutor prepared an exhibit that was shown to the jury during closing argument. When the defendants recognized this, they objected and

---

[6] Because the trial court found that the statement wrongfully implicated Harold and Winters, without implicating the other defendants, the trial court granted a new trial on this issue only to Harold and Winters.

moved for a mistrial, and the trial court denied the motion, but gave curative instructions telling the jurors to disregard the argument.

A trial court's decision not to grant a mistrial based on a prosecutor's improper argument will not be disturbed on appeal without a manifest abuse of discretion. *Harrell v. State*, 253 Ga. 474, 476 (4) (321 SE2d 739) (1984). Moreover, a new trial will not be granted unless it is clear that the trial court's curative actions failed to eliminate the improper argument from consideration by the jury. *Watkins v. State*, 237 Ga. 678, 683 (229 SE2d 465) (1976). As the court here gave proper curative, limiting instructions, we cannot say that it was an abuse of discretion to deny the motion for mistrial.

9. The appellants contend the trial court erred by denying a *Batson*[7] challenge to the prosecutor's use of peremptory challenges to strike seven African-American jurors. They contend the makeup of the initial panel was 50 percent white, 46.3 percent African-American, and three percent other. The prosecutor struck five African-Americans from the first panel and two more from the alternate panel. After the defendants challenged these strikes and without determining whether a prima facie case had been made under *Batson*, the trial court directed the prosecutor to give racially neutral explanations for the strikes. Thus, any issue regarding whether the appellants established a prima facie case is moot. *Barnes v. State*, 269 Ga. 345, 349 (6) (496 SE2d 674) (1998). Upon the prosecutor's explanation, the trial court found that the State gave sufficient neutral reasons for the strikes. Following the defendants' rebuttal, the trial court denied the challenge.

On appeal, the appellants have focused their attacks on the reasons the State gave for excusing three of the African-American jurors: One juror was excused because the juror knew a witness, another juror was excused because she had criminal justice training, and the last juror was excused because he had negative body language. The appellants contend the first two reasons were pretextual because white jurors with similar attributes were not excused, and because body language is too subjective to be a valid reason for excusing a juror.

In response to a motion pursuant to a *Batson* challenge, the State is required to provide race-neutral, case-related, clear, and reasonably specific explanations for striking the African-American jurors. *Barnes v. State*, supra, 269 Ga. at 349 (6). In this case, after hearing the State's explanation and the defendants' rebuttal, the trial court found no discriminatory pattern in the use of the State's peremptory challenges. That finding is entitled to great deference

---

[7] *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).

and will be affirmed unless clearly erroneous. *George v. State*, 263 Ga. App. 541, 545 (2) (a) (588 SE2d 312) (2003).

The appellants contend the evidence created a strong prima facie case and that the strength of the prima facie case is a factor to consider when determining whether the State provided an adequate explanation. *Lingo v. State*, 263 Ga. 664, 665 (1) (b) (437 SE2d 463) (1993). They further contend that the prosecutor's explanation must be evaluated in light of the fact that many of the jurors who were not struck had the same attributes as the African-American jurors who were struck. *Gamble v. State*, 257 Ga. 325, 327 (5) (357 SE2d 792) (1987). The appellants also contend the prosecutor's explanations were so implausible as to render the explanation pretextual. See *George v. State*, supra, 263 Ga. App. at 545 (2) (a).

The State contends the prosecutor offered nondiscriminatory reasons for striking the African-American jurors. In particular, a challenge based upon a witness's demeanor can be race neutral. *Snyder v. Louisiana*, ___ U. S. ___ (128 SC 1203, 1208, 170 LE2d 175) (2008). A juror knowing a witness is also a race-neutral reason for exercising a peremptory challenge. *Curles v. State*, 276 Ga. 237, 240 (5) (575 SE2d 891) (2003). Since the record establishes the State presented reasons for the strikes that have been recognized as race-neutral, we conclude the trial court's determination that the defendants established no discriminatory pattern was not clearly erroneous and provides no basis for reversal.

10. The appellants contend the trial court erred by denying their challenge for cause of a juror they contend could not speak English because she admitted that she "missed a few things" even though she was paying attention. See OCGA § 15-12-163 (b) (6). When asked by the court whether she could perform the duty of a juror, however, the juror stated that she could. Consequently the trial court denied the appellants' challenge for cause. We find no error.

> The decision to strike a potential juror for cause lies within the sound discretion of the trial court and will not be set aside absent some manifest abuse of that discretion. *Stokes v. State*, 281 Ga. 825 (2) (642 SE2d 82) (2007). Based on our review of the record, we find no error. See *Ford v. State*, 289 Ga. App. 865 (1) (658 SE2d 428) (2008) (trial court did not abuse discretion in finding that juror showed no visible sign of difficulty with English language); compare *Wellons v. State*, 266 Ga. 77 (6) (b) (463 SE2d 868) (1995) (trial court properly excused for cause prospective juror with evident language difficulties).

*Abdullah v. State*, 284 Ga. 399, 400 (2) (667 SE2d 584) (2008).

11. The appellants also contend the trial court erred by denying their challenge for cause of a juror who had a fixed opinion, amounting to a prejudgment of the case. This issue arose when a juror said that from the media he knew that a Sam's Club had been robbed and the manager kidnapped and murdered. When questioned by the State, the juror said that he would try to set the information aside, but when questioned by defense counsel he admitted that it would bother him and upset him; he thought it was a horrible thing. The juror was equivocal when asked whether his misgivings would affect his ability to be fair and impartial, and the trial court then addressed the juror:

> The question really comes down as to whether your feelings that you have appl[y] to the person — that is, these individuals — or whether it applies simply to the offense for which they stand indicted. And that's the real question. If it is the former, that is that. . . . If it is the latter, that is, you're not — you don't have any feeling about these individuals themselves, but simply about the offense for which they are charged — if it is the offense for which they are charged, then that would not prejudice you in this case and you would be authorized to serve. Can you tell us which that is?

The juror responded that his reservations were about what the defendants were charged with and "what they have done." The trial court then denied the defendants' challenge for cause.

The appellants contend that this final answer, i.e., "what they have done," demonstrates that the juror was unable to set aside his opinion and decide the case based upon the evidence and the law as instructed by the trial court.

> Whether to strike a juror for cause lies within the sound discretion of the trial court. Before a juror is excused for cause, it must be shown that he or she holds an opinion of a defendant's guilt or innocence that is so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence and the court's instructions.

(Footnotes omitted.) *Head v. State*, 276 Ga. 131, 133 (2) (575 SE2d 883) (2003). Considering the juror's response to the trial court's questions, we conclude that the trial court did not err in determining that the juror did not hold a fixed and definite opinion of the appellants' guilt or innocence that would have prevented him from adjudicating their case based solely upon the evidence and the jury

charge. Id. Therefore the trial court did not err by denying the defendants' challenge of this juror for cause. See also OCGA § 15-12-164 (b).

12. Ronald Coleman and Carlston Coleman contend their convictions for the crimes associated with Holt and Sam's Club must be reversed because they were based upon the uncorroborated testimony of an accomplice, Easterling. See OCGA § 24-4-8. The State contends, however, that Easterling was not an accomplice because he testified that his involvement in the Sam's Club crimes was coerced by Carlston Coleman who threatened him with a gun. He further testified that Carlston Coleman told him where to go and what to do under threat of death if he did not follow orders, and after the crimes were committed Coleman repeatedly threatened to kill him if he told anyone what he saw that night. Also, Easterling testified that after they left the scene of the crimes, Carlston Coleman stabbed him in the arm with a knife to emphasize the seriousness of Easterling's predicament if he revealed what had happened.

An accomplice is one who acts as the result of free will and not of duress or coercion. *Milton v. State*, 248 Ga. 192, 196 (2) (282 SE2d 90) (1981). Thus, if a witness testifies that he acted out of fear and coercion, not free will, the jury must decide whether the witness is an accomplice. Should the jury decide that the witness is not an accomplice due to coercion, the corroboration requirement is eliminated. *Kelly v. State*, 270 Ga. 523, 525 (2) (511 SE2d 169) (1999). Because the evidence authorized the jury to conclude that Easterling was coerced and not an accomplice, no corroboration was required and the evidence was sufficient to sustain the convictions of Ronald Coleman and Carlston Coleman for these crimes. Id. Therefore, we have not considered whether the evidence presented was sufficient to corroborate Easterling's testimony if he were deemed an accomplice.

13. Ronald Coleman contends the State improperly argued that he failed to present alibi evidence in his own defense. The State contends that its argument was not a comment upon the defendant's failure to testify. We agree. Although a prosecutor may not comment on a defendant's failure to testify, it is not error nor is it improper for a prosecutor to comment upon the defense's failure to rebut the proof presented by the State. *Martin v. State*, 193 Ga. App. 581, 585 (4) (388 SE2d 420) (1989). Here, the prosecutor's comments were not directed toward Coleman's failure to testify, but rather toward the defense's failure to rebut the State's evidence. Accordingly, we find no error.

14. Ronald Coleman alleges that the trial court erred by allowing the State to introduce Carlston Coleman's recorded statement which he contends incriminated him in violation of the rule announced in *Bruton v. United States*, 391 U. S. 123 (88 SC 1620, 20 LE2d 476)

(1968). Pretermitting whether the statement was admissible as a statement of a co-conspirator,[8] we find no error because Carlston Coleman testified and was subject to cross-examination. See *Brown v. State*, 266 Ga. 633, 635 (2) (469 SE2d 186) (1996) (if co-conspirator testifies at trial and is subject to cross-examination, the concerns of OCGA § 24-3-52 (conspirator's confession admissible only against himself) are satisfied). Further, "*Bruton* only excludes statements by a non-testifying co-defendant that directly inculpate the defendant." (Footnote omitted.) *Moss v. State*, 275 Ga. 96, 98 (2) (561 SE2d 382) (2002).

15. Overton alleges that the State erred by eliciting evidence of his bad character from a witness. He contends the prosecutor did so when he asked questions about comments that a witness heard Carlston Coleman make in Overton's presence. The witness answered that Coleman told Overton that he, Coleman, would "leave a person stinking somewhere," and the witness explained that this statement meant that Coleman would leave a person where no one could find him. Relying upon OCGA § 24-2-2 (the general character of the parties and their conduct in other transactions is irrelevant) and the fact that this conversation was not revealed to him in discovery, Overton moved for a mistrial.

Whether to grant a mistrial is within the sound discretion of the trial court and his ruling will not be disturbed absent an abuse of discretion. *Ladson v. State*, 248 Ga. 470 (285 SE2d 508) (1981). Pretermitting whether the witness's comments placed Overton's character in issue, we find it highly probable that any error did not contribute to Overton's conviction, and accordingly we find that any error was harmless. *Johnson v. State*, 238 Ga. 59, 60 (230 SE2d 869) (1976); *Palmer v. State*, 186 Ga. App. 892, 897 (369 SE2d 38) (1988).

16. Carlston Coleman contends the trial court erred by allowing the State to introduce the statements he made to a GBI agent because the statements were not freely and voluntarily given without hope of benefit. See OCGA § 24-3-50 ("To make a confession admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury."). Carlston alleges that he made the statement so that he would be released from jail where he was being held on other charges. The "hope of benefit" to which this section refers, however, is usually a hope of lighter punishment. *Caffo v. State*, 247 Ga. 751, 757 (3) (279 SE2d 678) (1981); *Burton v. State*, 212 Ga. App. 100, 102 (2) (441 SE2d 470) (1994). Consequently, being released is not a hope

---

[8] "After the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." OCGA § 24-3-5.

of benefit that would implicate this code section. Further, even if we were to find that the GBI agent said that Coleman would be released if he gave him information, this would be an offer of a collateral benefit which does not invalidate the statement. *Head v. State*, 180 Ga. App. 901 (1) (350 SE2d 854) (1986). The trial court did not err by allowing these statements to be introduced in evidence.

*Judgment affirmed. Johnson, P. J., and Phipps, J., concur.*

DECIDED NOVEMBER 26, 2008 —
RECONSIDERATION DENIED DECEMBER 15, 2008 — ▮▮▮▮▮

*Peter D. Johnson*, for appellant (case no. A08A1192).
*William M. Fleming*, for appellant (case no. A08A1193).
*Barbara B. Claridge*, for appellant (case no. A08A1194).
*Gonzalez & Waddington, Michael S. Waddington*, for appellant (case no. A08A1717).
*Daniel J. Craig, District Attorney, Charles R. Sheppard, William L. Bowcutt, Assistant District Attorneys*, for appellee.