[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-14935

_____

D.C. Docket No. 1:01-cv-01296-WBH

MARCUS A. WELLONS,

Petitioner - Appellant,

versus

WARDEN, GEORGIA DIAGNOSTIC
AND CLASSIFICATION PRISON,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(September 19, 2012)

Before DUBINA, Chief Judge, TJOFLAT, and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Marcus Wellons, a death row inmate, appeals the district court's denial of

his petition for writ of habeas corpus brought pursuant to 28 U.S.C. § 2254.  In his petition, Wellons contends that he was denied a fair trial by an impartial judge and an unbiased jury, because the jury gave the judge and the bailiff inappropriate gag gifts at the conclusion of the trial.  Wellons also contends that there was racial discrimination in the selection of the jury.  We affirm the district court's denial of relief.

## I. History

A. Factual Background

During the summer of 1989, Wellons lived with his girlfriend, Gail Saunders, and her fourteen-year-old son in Saunders's apartment.  The son was friends with fifteen-year-old India Roberts, who lived in the same apartment complex.  On August 30, 1989, Saunders ended the relationship with Wellons.  That night Saunders stayed with a friend and Wellons stayed in the apartment.  Over the course of the night, Wellons became distraught and unbalanced.  He desperately tried to reach Saunders by telephone.  Wellons was angry because he could not find her and began drinking heavily.  He then destroyed Saunders's apartment and property and attempted to hide the destruction by calling 911 to report a robbery.

Several hours later, at approximately 8:00 a.m., India Roberts left her home

2

to catch the school bus.  Shortly thereafter, a neighbor heard muffled screams coming from the Saunders's apartment.

Around 2:00 p.m., Wellons attempted to borrow a car from an acquaintance who worked at a nearby grocery store.  The acquaintance refused.  Approximately thirty minutes later, Theodore Cole, a retired military police officer, was driving by a wooded area near Saunders's apartment complex.  Cole spotted in the distance a person carrying what appeared to be a body wrapped in a sheet.  He drove back to the apartment complex and saw a man throw a sheet into the woods; Cole then called 911.  The police found India Roberts's body near the location where Cole had spotted the man in the woods.  Cole positively identified Wellons as the man he saw carrying the sheet.  The police eventually found several items belonging to India Roberts inside Saunders's apartment.

B. Trial and Appeals

Wellons was charged with the malice murder and rape of India Roberts. During jury selection, the prosecutor used his peremptory strikes to remove three of the four African Americans from the jury venire.  Wellons objected, asserting that the prosecutor had a race-based motive for removing the jurors in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1985).  The race-neutral reason proffered by the prosecutor was that the jurors were hesitant about their

3

willingness to impose the death penalty, if necessary. The trial court found no purposeful discrimination and overruled the objection to the peremptory strikes.

During the trial, Wellons did not dispute that he murdered and raped India Roberts; rather, he claimed he was either not guilty by reason of insanity or guilty but mentally ill. However, Wellons did not present any mental health expert testimony during the trial. The jury found Wellons guilty of malice murder and rape. After finding two statutory aggravating circumstances, the jury recommended that Wellons be sentenced to death for the murder, and life imprisonment for the rape.

During the post-trial interviews of the jurors, defense counsel learned that some jurors gave gag-gifts to one of the bailiffs and the trial judge either near the end of or immediately following the penalty phase. Specifically, some jurors gave the Judge[1] chocolate candy in the shape of a penis and Bailiff LP chocolate candy shaped as female breasts. Counsel also learned that while the sequestered jurors ate dinner at a local restaurant, the Judge spoke to them. Relying on this information, Wellons moved for a new trial and recusal of the Judge. The court denied both motions. During the state and federal proceedings, Wellons was never

---

[1] We will refer to the state trial court judge who received the gift as "Judge," and the bailiff who received the gift as "Bailiff LP." We will only use the jurors' initials.

4

given an evidentiary hearing regarding his claims of juror, bailiff, and judicial misconduct.

The Supreme Court of Georgia affirmed the state trial court's *Batson* decision and Wellons's convictions and sentences. *Wellons v. State*, 463 S.E.2d 863 (Ga. 1995). After the Supreme Court of the United States denied certiorari, *Wellons v. Georgia*, 519 U.S. 830, 117 S. Ct. 97 (1996), Wellons sought state habeas corpus relief, which was denied in an unpublished order on July 20, 1998. The Georgia Supreme Court, on January 9, 2001, denied Wellons's application for a certificate of probable cause to appeal. The Supreme Court of the United States again denied Wellons's petition for a writ of certiorari. *Wellons v. Turpin*, 534 U.S. 1001, 122 S. Ct. 476 (2001).

On May 19, 2004, Wellons filed a § 2254 petition in the Northern District of Georgia. The district court denied Wellons's petition. A Certificate of Appealability ("COA") was granted on the claim of juror, bailiff, and judicial misconduct, but no COA was grated on the *Batson* claim. On review we affirmed the district court's denial of Wellons's petition. *See Wellons v. Hall*, 554 F.3d 923 (11th Cir. 2009), *vacated*, 558 U.S. ___, 130 S. Ct. 727 (2010) (per curiam). In denying Wellons's claim of jury, bailiff, and judicial misconduct, we found that Wellons was not entitled to discovery or an evidentiary hearing because the

5

decisions of the Georgia courts to not grant discovery were "based on adequate and independent state law procedural grounds." *Id.* at 935 (internal quotation marks omitted). We also found that even if the claims were not procedurally barred "we would not disturb the Georgia Supreme Court's conclusions on the merits of these claims." *Id.* at 937–38. The Supreme Court granted Wellons's petition for a writ of certiorari, vacated our opinion, and remanded in light of *Cone v. Bell*, 556 U.S. 449, 129 S. Ct. 1769 (2009). *Wellons*, 558 U.S. ___, 130 S. Ct. at 732. We then remanded the case to the district court so that the parties could conduct discovery on the circumstances surrounding the alleged misconduct. *Wellons v. Hall*, 603 F.3d 1236, 1237 (11th Cir. 2010). The district court permitted discovery on the claim of juror, bailiff, and judicial misconduct and carefully considered the new evidence. In a thorough order, the district court denied relief. The district court issued a COA on the misconduct claim, and we issued a COA on the *Batson* claim.

## II. Standard of Review

We review the district court's denial of a petition for writ of habeas corpus *de novo*. *Jamerson v. Sec'y for Dep't of Corr.*, 410 F.3d 682, 687 (11th Cir. 2005). We also review the district court's conclusions of law and mixed questions of law and fact *de novo*. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001). Finally, we review the district court's factual findings for clear error. *Id.*

6

Wellons's petition is governed by 28 U.S.C. § 2254(d), as amended by the Antiterroism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996).  Under AEDPA, federal courts review state court judgments utilizing a highly deferential standard.  *Jamerson*, 410 F.3d at 687.  When a state court has adjudicated a claim on the merits, we can only grant relief if that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or if that decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A state court's adjudication is contrary to federal law if it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523 (2000).  A state court's adjudication is unreasonable if the state court "identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.*

In reviewing whether a state court's decision was based on an "unreasonable determination of the facts" under § 2254(d)(2), we presume the state court's factual findings are correct, and the petitioner has the burden to rebut those facts by clear

7

and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).  This statutory presumption of correctness applies to the factual determinations of both state trial and appellate courts.  *Bui v. Haley*, 321 F.3d 1304, 1312 (11th Cir. 2003).

### III. *Batson* Claim

We begin with the *Batson* claim.  In *Batson*, the Supreme Court held that the prosecution violates the Equal Protection Clause when it strikes potential jurors solely on the basis of race.  476 U.S. at 93–94, 106 S. Ct. at 1721–22.  In *Purkett v. Elem*, the Supreme Court summarized the three-step process required to establish a claim under *Batson*.  *Elem*, 514 U.S. 765, 767, 115 S. Ct. 1769, 1770–71 (1995) (per curiam).  The first step requires the opponent of the peremptory challenge to establish a *prima facie* case of discrimination.  *Id.*, 115 S. Ct. at 1770.  The second step shifts the burden to the proponent of the strike "to come forward with a race-neutral explanation" for the strike.  *Id.*  The last step requires the trial court to decide if "the opponent of the strike has proved purposeful racial discrimination." *Id.*, 115 S. Ct. at 1770–71

During voir dire in Wellons's trial, the prosecution used peremptory strikes to remove three of the four African-American jurors from the venire.  Wellons objected, and the prosecution explained that each of the three jurors was reluctant

8

to impose the death penalty.  The state trial court determined that Wellons failed to establish purposeful discrimination and permitted the strikes.  On direct appeal, Wellons contended that the state's reasons were pretextual because the state did not strike Caucasian jurors who were just as reticent to impose the death penalty as the struck African-American jurors.  In rejecting Wellons's contentions, the Georgia Supreme Court found that "[t]he trial court's determination that Wellons failed to establish purposeful discrimination was not clearly erroneous" because each of the Caucasian jurors who were not struck "also expressed moderate to strong reservations about a mental health defense."  *Wellons*, 463 S.E.2d at 877.  Because Wellons relied upon a mental health defense at trial, it was reasonable for the Georgia Supreme Court to find that "on balance, th[e Caucasian] jurors were more favorable for the state than for the defense."  *Id.*

We find that the Georgia Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly established Federal law.  The record shows that the prosecution struck four Caucasian and three African-American jurors because they were not able to fairly consider or impose the death penalty.  The three African Americans that were struck were Ms. Fooster, Ms. Stokes, and Mr. Fitzgerald.  The four Caucasian jurors that were struck were Ms. Cannon, Ms. Payne, Ms. Beard, and Ms. Whitaker.  To show purposeful

9

discrimination Wellons points to four hesitant Caucasian jurors that despite their hesitancy about the death penalty were selected for the jury. Wellons specifically cites to Juror DD, Mr. Anderson,[2] Juror PS, and Juror MG.

### A. The Struck African American Jurors

#### 1. Ms. Fooster

Ms. Fooster, after being asked several questions by the prosecution regarding her belief about the death penalty, stated: "You know, you're asking me questions and I'm answering . . . But then sometimes you have to get to that point. So I'm—I'm not sure if I'm making a clear statement." The prosecutor then asked, "In other words, it's easy for us to ask these hypothetical questions now. But are you saying that it would be difficult if you reached that point, and you don't know if your answer would be the same." Fooster answered, "Yeah, that's what I'm saying." **[Resp't. Ex. 8 at 254]** Ms. Fooster, however, was unequivocal in her belief that people could be rehabilitated and that mental health defenses should be considered if properly presented by the defendant. **[Resp't. Ex. 8 at 258]**

#### 2. Ms. Stokes

---

[2] Mr. Anderson was not selected as a juror, because he was struck by the defense.

10

When the prosecutor asked Ms. Stokes if it would be difficult for her to impose the death penalty, she stated "I don't know.  I might have a problem with it, and I may not."  **[Resp't. Ex. 8 at 312]**  Ms. Stokes did state she had "mixed feelings" about mental health defenses but also promised to keep an "open mind" and consider all the evidence presented before making a decision.  **[Resp't Ex. 8 at 326–27]**

### 3. Mr. Fitzgerald

Mr. Fitzgerald stated that the death penalty was "not an easy thing for anybody to decide on.  It's just the law."  **[Resp't. Ex. 10 at 981]**  He also believed that people could be rehabilitated and that he would listen to any mental health defenses presented.  **[Resp't. Ex. 10 at 983–84]**

### B. The Struck Caucasian Jurors

### 1. Ms. Cannon

Ms. Cannon used uncertain language in answering whether she could return a verdict for the death penalty.  For example she explained her views of the death penalty as something she "would think more about" and "certainly wouldn't just jump to a conclusion."  **[Resp't. Ex. 8 at 451]**  She also could fairly consider any mental health defenses.  **[Resp't Ex. 8 at 454]**

### 2. Ms. Payne

11

Ms. Payne, in explaining her views of the death penalty, stated that she considered life imprisonment to be just as horrible a penalty as death. **[Resp't Ex. 9 at 563]** Ms. Payne also felt very strongly that there should be rehabilitation in prison and that people could be rehabilitated. **[Resp't Ex. 9 at 594]**

### *3. Ms. Beard*

Ms. Beard explained her evolving views of the death penalty as "Well, . . . several years back, [I] felt that maybe we did not have the right to make that decision on capital punishment. Since then, I think I have become more conservative, more law and order. . . [b]ut I still . . . am not a real strong believer in it." **[Resp't Ex. 10 at 764]**

### C. The Hesitant Caucasian Jurors Who Were Selected

The Caucasian jurors, who Wellons claims the prosecution did not strike despite their hesitant answers regarding the death penalty, were more favorable to the prosecution because they did not have a favorable view of mental health defense. Juror DD stated that she had "mixed feelings" about the death penalty but "believe[d] in it in certain circumstances." **[Resp't Ex. 10 at 837]** However, she also "doubt[ed] that fifty percent of the people could be [rehabilitated]." **[Resp't**

12

**Ex. 10 at 840–41]**[3] When asked if he could vote for the death penalty, Mr. Anderson stated "I think I could, yes." **[Resp't Ex. 10 at 1095]** He also stated that in some of the cases he heard about, he "really question[ed]" the defendant's plea of insanity, but "couldn't pass judgment over [those cases]" without knowing the facts. **[Resp't Ex. 10 at 1100]** Juror PS unequivocally answered that he could equally consider the death penalty as well as life and return a verdict for the death penalty in open court. **[Resp't Ex. 10 at 1072]** Juror PS also stated that he leaned more towards believing mental health defenses being a "cop-out" but would still fairly consider the evidence. **[Resp't. Ex. 10 at 1076]** Although Juror MG stated that the death penalty weighed "heav[il]y on [her] heart," **[Resp't Ex. 10 at 943]** she described mental health defenses as "a bunch of bull." **[Resp't Ex. 10 at 946]**

Considering this record, we cannot say that the Supreme Court of Georgia unreasonably applied constitutional law, especially given the highly deferential standard required by AEDPA. *Jamerson*, 410 F.3d at 687. The prosecution struck both Caucasian and African Americans for giving equivocal answers regarding the imposition of the death penalty. Furthermore, the few jurors that were hesitant about the death penalty but were not struck by the prosecution felt strongly that

---

[3] We note that after Juror DD was selected, she admitted to the Judge and counsel that she did not think she could emotionally handle serving on the jury. The prosecution attempted to have her removed from the panel, but the defense objected.

13

mental health defenses were questionable, which was favorable for the prosecution. Thus, it was also not unreasonable for the Georgia Supreme Court to find that Wellons did not prove purposeful discrimination by the state. Thus, we affirm the denial of habeas relief on this ground.

## IV. Alleged Juror, Bailiff, and Judicial Misconduct

### A. Background

The Supreme Court vacated our prior opinion and remanded this case back to us, suggesting that "[t]he disturbing facts of this case raise serious questions concerning the conduct of the trial." *Wellons* 130 S. Ct. at 728. Consequently, we remanded the case back to the district court for discovery and new consideration of Wellons's claims. On remand, the parties deposed ten jurors, the state court Judge who presided at the trial, some of the Judge's staff, and individuals from the Cobb County Sheriff's Office.[4] The depositions focused on three major events: (1) the encounter between the Judge and the jury during dinner, (2) the jury's gift to the Judge, and (3) the jury's gift to Bailiff LP. We draw the remaining facts from the Joint Stipulation of Facts Obtained Through Discovery filed by the parties after discovery and the district court's order below.

---

[4] By the time discovery was conducted (about twenty years after the trial), two of the jurors and one of the bailiffs had passed away.

14

During trial, a Major in the Sheriff's Office was responsible for courtroom security and for the jury. The bailiffs who worked for the Judge assisted the Sheriff's Office in supervising the jurors. During the guilt and penalty phases of the trial, the jury was sequestered at a hotel, and two bailiffs stayed with the jurors each night at the hotel. The jurors each had individual rooms without a television. The jurors were permitted to watch television in a common room, which a deputy sheriff controlled. The jurors were allowed to phone their families, but they did not have any visitation with family. Some of the jurors' family members came to the trial and observed. The Major and at least two sheriff's deputies accompanied the jurors to breakfast and dinner each day. Dinner was usually at a local restaurant chosen by the Major.

Neither the Judge nor the Major have an independent memory of the instructions that they gave their employees regarding their conduct with this particular jury. The Judge and the Major generally instruct their bailiffs to not speak with the jurors except to determine if they need something.

### 1. The Encounter at the Restaurant

During the trial, the Judge encountered the jury at dinner. Some of the jurors have no recollection of the encounter. The Judge, Bailiff LP, and most of the jurors testified that the Judge waived or nodded and made a brief comment.

15

One juror recalls that the encounter occurred on the day the jurors saw the autopsy photos, which had upset some of the jurors, and that the Judge commented that she understood that the jurors were upset.

### 2. The Gift to the Judge

Of the ten jurors that were deposed, four did not learn about the inappropriate gifts until 2010, and one was uncertain about when he first learned of the gifts. Juror MH admitted to giving the Judge white chocolate in the shape of a penis. She testified that she called her husband to request that her friend—who owned a confectionary shop—make chocolate turtles for the jury. When Juror MH received the box of turtles from her husband, Bailiff LP and Juror LH were present. The friend, in addition to the turtles, included the white chocolate penis as a gag gift to lighten things up. Juror MH also testified that the friend did not know the facts of the case. Juror MH recalls that Bailiff LP told her that the Judge wanted to see it.

On the last day of the trial, Juror MH testified that she took the chocolate, which was in a box and inside a bag, to the jury room. Juror MH gave the gift to the Judge in the jury room, and the Judge slid the gift into her sleeve. Juror MH also states that she tried to keep the gift a secret from the rest of the jury members. Another juror has similar memories of the event, except that this juror does not

16

recall how the Judge received the gift.

Juror LH recalled that one of the other jurors knew someone who had a bakery and that some of the jurors wanted to have her bake something for the Judge. The jurors wanted to give a gift to the Judge because the Judge had been very good about making sure the jurors' needs were met during the trial. Juror LH remembers that when the jurors were discussing what they could give to the Judge, they were in a silly mood. Juror LH testified that someone mentioned baking the Judge something in the shape of a penis, but Juror LH did not think any of the jurors would actually go through with it.

Juror PS recalls hearing about penis-shaped chocolate candy in the jury room. He also recalls seeing a box in the jury room, but he did not see what was inside the box. Juror PS assumed it was the gag gift because he heard someone say "we got it." He thought it was strange to give such a gift to the Judge. Juror PS remembers seeing the Judge with the box on "her desk in the courtroom" when the Judge thanked them for their service.

Bailiff LP testified that Juror MH told her about the chocolate. The next morning, Bailiff LP told the Judge about the chocolate and the Judge replied, "weird." Bailiff LP also remembers the jurors asking if she told the Judge about the chocolate. Bailiff LP replied that she told the Judge and that the Judge just

17

shrugged her shoulders and laughed it off.  Bailiff LP stated that the Judge did not ask to see the chocolate, and Bailiff LP testified that she did not tell the juror that the Judge requested to see the chocolate.  Because Bailiff LP had to leave prior to the end of the trial to tend to her sick mother, she is not aware how the Judge received the gift.

The Judge testified that she first knew of the gag gift when someone on the court staff gave it to her a day or two after the trial.  She did not discuss the gift and did not show it to anyone.  She did not report it to counsel for the state or the defense.  She eventually threw it out.

### 3. The Gift to the Bailiff

Bailiff LP received an inappropriate gift of white chocolate in the shape of female breasts from the jurors.  Five of the jurors deposed knew nothing of the chocolate breasts until 2010, and one juror could not recall when he heard of the gift.

After Bailiff LP returned from caring for her sick mother, the court clerk gave her a box containing white chocolate breasts monogrammed "[Bailiff's first name]'s hooters."  Bailiff LP does not know who gave her the gift.  She thinks that the gift may been prompted by a discussion at dinner between two of the younger male jurors.  The two jurors were discussing how their grandmothers had ample

18

chests and that when their grandmothers hugged them they felt they would be suffocated. Bailiff LP then joined the conversation by lamenting the fact that she would be remembered by her grandchildren for her ample chest. None of the male jurors deposed recalled this conversation. Several of the jurors deposed recall hearing about the chocolate breasts but did not recall ever seeing the gift. Juror MH, who gave the gag gift to the Judge, knew nothing of the gift to Bailiff LP until well after the trial.

At some point after the trial, several of the jurors and their spouses had a reunion. No one discussed either of the gifts at the reunion.

B. Analysis

Wellons asserts that this misconduct denied him his constitutional right to a fair trial by an unbiased jury and an impartial judge. He cites several cases which call into question the impartiality of the jury and the judge. The Constitution affords defendants the right to an impartial jury and judge. *Parker v. Gladden*, 385 U.S. 363, 364, 87 S. Ct. 468, 470 (1966) (per curiam) (impartial jury); *Tumey v. State of Ohio*, 273 U.S. 510, 535, 47 S. Ct. 437, 445 (1927) (impartial judge). Due process requires "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."

*Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct. 940, 946 (1982).  Without condoning the regrettable behavior of either, we conclude that both the jury and the Judge remained impartial and unbiased throughout the trial.

### 1. Impartial Judge

The Georgia Supreme Court denied an evidentiary hearing on this claim and alternatively found that the Judge was not biased.  *Wellons*, 463 S.E. 2d at 880 ("Assuming that the trial judge in fact encountered and spoke to the jurors in a restaurant and that she and a bailiff were the passive recipients of gag gifts, there was no basis for concluding that judicial bias existed.").  Therefore, we review the state court's adjudication under the exacting AEDPA standard.  Even taking into consideration the new facts found in discovery in the federal district court, nothing in the record indicates that the Georgia Supreme Court's alternative finding was an unreasonable application of Federal law.

Although *ex parte* communications between the judge and jury are improper and the prejudice caused by such communications may mandate habeas relief, the occurrence of an unrecorded *ex parte* communication, standing alone, does not require that a conviction be overturned.  *See Rushen v. Spain*, 464 U.S. 114, 118, 104 S. Ct. 453, 455–56 (1983) (per curiam) (holding that *ex parte* communication between judge and juror is not *per se* prejudicial and noting that "[t]here is scarcely

20

a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial"). The Georgia Supreme Court correctly assumed the Judge was only a passive recipient of a gag gift. Additionally the record does not indicate that the Judge showed any partiality during the brief encounter at the restaurant; rather, the record supports the state court's finding that the Judge was not biased. She was neutral during the short conversation at dinner and only noted that seeing any autopsy photos would be upsetting. She did not give the jurors any indication as to how this case should be decided. Thus, even an unrecorded *ex parte* communication, such as this, is acceptable because it merely reflects the "day-to-day realities of courtroom life" in which a juror has occasion to speak to the judge regarding an aspect of the trial. *Spain*, 464 U.S. at 119, 104 S. Ct. at 456.

The interaction between the Judge and the jury—the brief encounter at a restaurant and a gag gift—is starkly different from the cases that Wellons contends require us to reverse the district court's decision. First, Wellons cites to *Tumey*. There a judge received payment for his time only if the defendant was convicted. 273 U.S. at 523, 47 S. Ct. at 441. Because the judge there had "a direct personal pecuniary interest in convicting the defendant who came before him for trial," the Supreme Court found that the judge could not be impartial. *Id.* at 523, 47 S. Ct. at

21

441. *Tumey* is not instructive because the Judge here had no interest whatsoever in the outcome of Wellons's trial. Wellons also cites to *Edwards v. Balisok* in which a hearing officer was accused of intentionally suppressing evidence of innocence. 520 U.S. 641, 647, 117 S. Ct. 1584, 1588 (1997). *Edwards* is also not instructive because there is no indication here that the Judge attempted to suppress evidence of Wellons's innocence.

The record here does not support the contention that the Judge had any direct personal interest in the outcome of Wellons's trial or that the Judge attempted to sway the jury. We cannot say on this record that there was a demonstration of impartiality on the part of the trial judge. Therefore, we find that the Georgia Supreme Court reasonably found that the Judge was not biased and affirm the district court's denial of habeas relief.

*2. Impartial Jury*[5]

As was noted earlier, this appeal comes to us with an unusual procedural

---

[5] Wellons also discusses the fact that the sister of one of the jurors had been murdered eight years before Wellons's trial. This information was fully disclosed by the juror during voir dire, and Wellons did not object to the juror serving on the panel. **[Resp't. Ex. 10 at 833–34]** Wellons claims that this information further shows that the jury was biased against him and fleetingly mentions an ineffective assistance of counsel claim in his brief. Wellons was not granted a COA on an ineffective-assistance claim, and to the extent that Wellons now attempts to raise any issue that could arise from this juror's service on the panel, we agree with the district court that the issue is unexhausted and procedurally barred. *See Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 888 (1998) (per curiam).

22

history.  After discovery, it became apparent that Wellons could make a debatable claim that the jury was not impartial.  Given the posture in which this evidence came to light, the Georgia courts never had an opportunity to review this claim.  After *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388 (2011), it is unclear how federal courts should treat newly discovered evidence presented for the first time in federal court.  *See Gonzalez v. Wong*, 667 F.3d 965 (9th Cir. 2011) (staying the federal habeas action to permit petitioner to present the claim to state court); *id.* at 999–1017 (Fletcher, J., concurring in part) (finding that the federal court could adjudicate the claim *de novo* with new evidence considered); *id.* at 1017–21 (O'Scannlain, J., dissenting in part) (explaining that *Pinholster* forbids adjudication of the claim); *see also Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1294 n.16 (11th Cir. 2012) (noting that neither the Supreme Court nor the Eleventh Circuit has decided what standard of review applies "to evidence properly developed in a federal hearing").  We need not weigh in on this debate because even considering the evidence and conducting *de novo* review, we still find that Wellons is not entitled to relief.  *See Berghuis v. Thompkins*, 560 U.S. ___, 130 S. Ct. 2250, 2265 (2010) (permitting denial of "writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies").

Wellons relies on several cases calling into question the impartiality of a jury that is exposed to extrinsic evidence or contacts. "The jury is an essential instrumentality—an appendage—of the court, the body ordained to pass upon guilt or innocence. Exercise of calm and informed judgment by its members is essential to proper enforcement of law." *Turner v. Louisiana*, 379 U.S. 466, 472, 85 S. Ct. 546, 549 (1965) (quoting *Sinclair v. United States*, 279 U.S. 749, 765, 49 S. Ct. 471, 476 (1929)). A jury must base its verdict upon the evidence presented at trial. *Turner*, 379 U.S. at 472, 85 S. Ct. at 549; *see also Mattox v. United States*, 146 U.S. 140, 149, 13 S. Ct. 50, 53 (1892) (finding it "vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment"). The defendant has the burden to show that the jury was exposed to external evidence. *United States v. Ronda*, 455 F.3d 1273, 1299 (11th Cir. 2006) (citing *Remmer v. United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 451 (1954)). Once the defendant has established the exposure, the state has the burden to show that the exposure "was harmless to the defendant." *Remmer*, 347 U.S. at 229, 74 S. Ct. at 451.

The record establishes that the unfortunate giving of these tasteless gifts was nonetheless inconsequential to the verdicts, and otherwise played no part in the judge's or jury's consideration of the case. The two gifts were given independent

24

of each other, given at the conclusion of the trial, and none of the jurors testified that the gifts were based on anything that occurred during trial.  Furthermore, at most only a few of the jurors were involved in giving the tasteless gifts.  None of the jurors testified that the gifts bore any relation to their decision to find Wellons guilty of murder and rape, and they testified that the gifts did not affect their decision to impose the death penalty.

Wellons attempts to draw parallels to several cases in which the jury had inappropriate contacts with bailiffs, but his reliance on these cases is misplaced.  In *Turner*, the two deputy sheriffs who watched the jurors during trial were also the key witnesses in the defendant's trial.  379 U.S. at 473, 85 S. Ct. at 550.  The jury's close contact with two key witnesses was deemed inappropriate, especially given that the deputy sheriffs' credibility was a determining factor during trial.  *Id.*  In *Parker*, a bailiff made comments to a juror that the defendant was guilty and that if there was any error in the verdict that the Supreme Court would fix the error.  385 U.S. at 363–64, 87 S. Ct. at 470.  The Court reversed the conviction after finding that the statements denied the defendant his right to an impartial jury and that the statements prejudiced the defendant.  *Id.* at 364–65, 87 S. Ct. at 470–71.

The contact between Bailiff LP and the jury in this case is a far cry from *Turner* and *Parker*.  The record establishes that the conversation between Bailiff

25

LP and the jurors was not pertinent to the issues presented at trial. The conversation with Bailiff LP about grandmothers' bosoms could not plausibly affect the jury's thoughts on Wellons's guilt. Thus the record supports the Georgia Supreme Court's assumption that Bailiff LP was only a passive recipient of a tasteless gag gift. *See Wellons*, 463 S.E.2d at 880.

## V. Conclusion

We do not condone the acceptance of gifts, de minimus though they may be, by judges or bailiffs during any trial—criminal or civil. Nor do we condone the giving of gifts by the jury to the presiding judge or bailiff during any trial. Trial judges are expected to properly handle these situations, sternly admonish or discipline those involved, and disclose such occurrences to each party so that timely objections can be considered and made. The Judge here neglected to take such steps. Only because we have no doubt that the gifts did not factor into the judge or jury's ultimate consideration of the case are we able to affirm the denial of habeas relief.

We also acknowledge that the ill-advised actions of a few thoughtless jurors could create the perception that this jury was too busy joking around rather than deciding Wellons's fate. But these were two isolated incidents in the span of a multi-week trial and we cannot say, on the basis of this record, that the verdicts

26

were tainted.

We put a heavy burden on the twelve men and women of a jury when we take them away from their jobs, families and lives, summon them to the courthouse, sequester them, and ask them to decide whether a person charged with a capital crime should be put to death.  Although they were intended to bring a moment of levity to a serious and somber occasion, the gifts were tasteless and inappropriate.  But we are unable to conclude that this conduct amounts to juror or judicial misconduct of sufficient constitutional magnitude to warrant habeas corpus relief.

The jurors' testimony further supports the belief that Wellons was given a fair trial by an impartial jury.[6]  One of the jurors, after hearing the news reports of the gag gifts, began to weep "because [she] just couldn't believe that because we tried so hard to be so fair and so reverent about this whole thing."  Several other jurors testified that their time on the jury was overwhelming and painful.  Another juror described how the jury felt after they decided Wellons's sentence:

> What most people don't know is that when the decision was made and before we went out into the courtroom, it was about an hour that went by. And everybody was so shook at the idea of giving somebody a death penalty that we just stayed in there and held one another for one solid hour.  And if

---

[6] We note that counsel properly conducted the depositions and did not ask the jurors how they made their decisions.  *See Tanner v. United States*, 483 U.S. 107, 107 S. Ct. 2739 (1987).

27

anyone thinks that, despite the stupidity of [some] of the jurors, that this wasn't well thought out, then they got something else to think about. It was—it wasn't easy to go and take that upon yourself and say you're responsible. I don't care how much you kid about the word death. It's something else when you're making a mark on somebody else's life. And then we went out, and we held hands. But when I watched each one of the jurors stand up and say that that was their vote, those are the strongest voices you've ever heard. There wasn't anybody acting like they were pushed or whatever because it was 100 percent.

Wellons's claims have been seriously and thoroughly considered by state and federal courts at every level. The district court's denial of habeas relief is affirmed.

**AFFIRMED.**

28